# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

*FILED*

*JUN 21 2018*

*U.S. DISTRICT COURT-WVND*
*MARTINSBURG, WV 25401*

**MICHAEL W. FREDERICK and**
**DIANE H. FREDERICK**

    *Plaintiffs,*

    v.

**WEST VIRGINIA DEPARTMENT OF HEALTH**
**AND HUMAN RESOURCES, BRADLEY,**
**NICEWARNER, HALL, DUNCAN, DRISCOLL**
**JEFFERSON COUNTY, a** *West Virginia County***,**
**JEFFERSON COUNTY SHERIFF'S DEPARTMENT,**
**DOUGHERTY, HOLZ, DEMORY, LUPUS, MOSKOWITZ,**
**RJASKO, THOMAS and WINDLE, JEFFERSON COUNTY**
**PROSECUTING ATTORNEY'S OFFICE, LORENZETTI,**
**MATSCHAT, RASHEED and SIMS, JEFFERSON COUNTY**
**SCHOOL DISTRICT, GIBSON, BRITTINGHAM, CATON,**
**and ZIGLER, CHILDREN'S HOME SOCIETY OF WEST**
**VIRGINIA, BARTHLOW, SLATER-MADERT and HAWVER,**
**SAFE HAVEN CHILD ADVOCACY CENTER, BARTHLOW,**
**SLATER-MADERT, NATIONAL YOUTH ADVOCATE**
**PROGRAM, ELLENGERGER and KOHLER, CASA OF THE**
**EASTERN PANHANDLE, INC., BARNARD and OVERSTREET**

    *Defendants.*

**CIVIL COMPLAINT**

**CASE NO.** 3-18 cv 97

**JURY TRIAL DEMANDED**

TABLE OF CONTENTS

NATURE OF THE ACTION ............................................................ 1

  A.    Michael Frederick............................................................... 1

PARTIES.................................................................................. 4

  A.    The Plaintiffs............................................................... 4

  B.    The Defendants............................................................. 4

JURISDICTION AND VENUE.......................................................... 11

FACTUAL ALLEGATIONS.............................................................. 12

        1.    The Blue Ridge Elementary School Interview....................... 12

        2.    Conclusion of the Blue Ridge Elementary Investigation............. 15

        3.    Commencement of the Criminal Investigation by the
                  Jefferson County Sheriff's Office............................ 16

        4.    Continuation of DHHR Investigation, Safety Plan and
                  Care Management............................................. 17

        5.    S.F. Gives Contradictory Statements to CAC Forensic
                  Interviewer.................................................. 20

        6.    S.F. Recants Her Sexual Abuse Allegations.......................... 24

        7.    The Arrest of Plaintiff Michael Frederick............................ 25

        8.    Commencement of the Investigation by the Jefferson
                  County Prosecutor's Office................................... 28

        9.    U.S. District Court for the eastern District of Virginia
                  Probation Violation.......................................... 28

      10.    Initiation of DHHR Custody of S.F. and the Abuse &
                  Neglect Petition............................................. 29

      11.    The Medical Forensic Examination Contradicts
                  S.F. Claims............................................,.... 31

12.    The June 18, 2014 Federal Motions Hearing…………………..…. 33
13.    S.F.'s Prior History of False Sexual Abuse Allegations………….. 37

14.    June 23, 2014 Federal Evidentiary Hearing……………………… 38

15.    Inquiry by Loudoun County, VA Sheriff's Office………………… 41

16.    Kingship Support Placement……………………………………… 43

17.    Court Appointment of CASA……………………………………… 44

18.    The July 1, 2014 Preliminary Hearing for the Petition
          for Termination of Parental Rights………………………… 45

19.    The July 2, 2014 Preliminary & Probable Cause Hearing
       for Fleeing On Foot, Obstruction and Sexual Abuse
       by Parent…………………………………………………………… 47

20.    The July 3, 2014 Federal Status Hearing for
       Supervisory Release……………………………………………… 51

21.    DHHR Removal of Infant Child S.F.……………………………… 52

22.    Search Warrant for S.F.'s Diary & Defendant's Refusal
       to Consider Exculpatory Evidence……………………………… 55

23     DHHR Placement of Infant Child S.F.…………………………… 56

24.    GoFundME  "Help an Innocent Man and Our Daughter………….. 57

25.    DHHR Continues to Apply Pressure……………………………… 59

26.    Jefferson County Prosecuting Attorney's Office Refusal to
       Consider Evidence Prior to Indictments………………………… 60

27.    Post-Adjudicatory Improvement Period and Psychological
       Evluation……………………………………………………………… 62

28.    Relinquishment of Plaintiff's Parental Rights…………………….64

29.    Intimidation of Plaintiff's Alibi Witness…………………………65

30.    Intentional Infliction of Emotional Distress…………………….. 69

31.    The Manufactured Arrest of Plaintiff by the Jefferson County
       Prosecutor's Office and the Department of Health & Human
       Services...................................................................................72

       a.    The May 11, 2015 Hearing..........................................77

       b.    The May 18, 2015 Hearing..........................................79

       c.    Continuation of Obstruction of Justice................ ......... 85

       d.    The October 27, 2015 Hearing.................................. 87

32.    Jefferson County Prosecuting Attorney's Office Continued
       Efforts to Control Plaintiff's Electric Monitoring
       and Detainment.........................................................................90

       a.    The November 2, 2015 Bond Hearing - Part I................. 90

       b.    Renewed Motion to Terminate Federal Supervised
             Release................................................................. 91

       c.    Additional Confirmation of Detective Demory
             Testimony During the October 27, 2015 Trial............... 93

33.    Conspiracy to Hide Exculpatory Evidence by the
       Jefferson County Prosecuting Attorney's Office and the
       Department of Health & Human Resources........................... 93

       a.    The November 2, 2015 Bond Hearing – Part II.............   97

       b.    The March 7, 2016 Hearing.................................... 101

       c.    The March 8, 2015 Hearing.................................... 105

       d.    Court Summation and Decision to Release Records......... 111

       e.    Breach of Prosecution's Duty ................................. 115

       f.    Efforts to Conceal Defendants' Malicious Prosecution
             and the Obstruction of Justice.................................   117

34.    The State of West Virginia Disciplinary Counsel...................   123

35.    December 21, 2016 Evidentiary Hearing............................   124

-iii-

36.   March Hearing 2017................................................... 128

38.   Dismissal of Plaintiff's Misdemeanor & Criminal Charges......... 129

B.   NATURE OF THE ACTION Arising Out of the Same Occurrence:
Plaintiff Diane Frederick ............................................... 130

FEDERAL LAW CLAIMS AGAINST ENTITIES.................................. 133

<u>Violation of 42 U.S.C. § 1983 of Plaintiff's Fourth and Fourteenth Amendment Rights</u>

Count 1:  Unlawful Seizure against Defendants County, School, School
District, DHHR and Sheriff's Department............................ 133
Count 2:  Unlawful Seizure against Defendants County, Prosecutor and
Sheriff's Department................................................... 136
Count 3:  Unlawful Seizure against Defendants County, CHS, CAC
and DHHR............................................................... 138
Count 4:  Concealment of Evidence Violations against Defendants County,
Prosecutors Office and DHHR......................................... 140
Count 5:  Conspiracy Violations against County, Prosecutor's Office,
Sheriff's Department, DHHR, and CHS Defendants.................. 142
Count 6:  Fabrication of False Evidence Against County, Prosecutor's
Office and Sheriff's Department...................................... 143

<u>Conspiracy in Violation of 42 U.S.C. § 1985(2) and (3)</u>

Count 7:  Obstruction of Justice against County, Prosecutor's Office and
Sheriff's Department................................................... 145
Count 8:  Witness Tampering against County, Prosecutor's Office, DHHR
And NYAP.............................................................. 147

<u>Conspiracy in Violation of 42 U.S.C. § 1986</u>

Count 9:  Conspiracy against All Supervisory Defendants.................... 149

<u>Violation of 42 U.S.C. § 1983 of Plaintiff's Fourteenth Amendment Equal
Protection Rights</u>

Count 10:  Against Defendant DHHR........................................... 151
Count 11:  Against Defendants CHS and CAC.................................. 153
Count 12:  Against Defendants County and Sheriff's Department............. 154
Count 13:  Against Defendants School and School District................... 156
Count 14:  Against Defendant NYAP........................................... 157
Count 15:  Against Defendant CASA........................................... 159

-iv-

Violation of 42 U.S.C. § 1983 of Plaintiff's Fourteenth Amendment Due Process Rights

Count 16: Against Defendant DHHR…………………………………………… 160
Count 17: Against Defendants CHS and CAC……………………………… 162
Count 18: Against Defendants County and Sheriff's Department………….. 164
Count 19: Against Defendants School and School District…………………. 166
Count 20: Against Defendant NYAP……………………………………….. 168
Count 21: Against Defendant CASA……………………………………….. 170

Count 34: Against Individual Prosecutor and Sheriff's Department
 Defendants……………………………………………………… 193
Count 35: Against Individual School and School District Defendants……… 195
Count 36: Against Individual NYAP Defendants……………………………. 197
Count 37: Against Individual CASA Defendants……………………………. 198

Violation of 42 U.S.C. § 1983 of Plaintiff's Fourteenth Amendment
Due Process Rights

Count 38: Against Individual DHHR Defendants…………………………... 200
Count 39: Against Individual CHS and CAC Defendants…………………... 201
Count 40: Against Individual County and Sheriff's Department
 Defendants……………………………………………………… 203
Count 41: Against Individual Defendants School and School District……... 204
Count 42: Against Individual NYAP Defendants…………………………… 205
Count 43: Against Individual CASA Defendants…………………………… 207

FEDERAL LAW CLAIMS AGAINST INDIVIDUALS IN THEIR PERSONAL
CAPACITY…………………………………………………………………… 209

Violation of 42 U.S.C. § 1983 of Plaintiff's Fourth and Fourteenth Amendment Rights

Count 44:  Unreasonable Seizure against Individual School, School
 District, DHHR, CHS and CAC Defendants……………………. 209
Count 45: Unreasonable Seizure against Individual Prosecutor's Office
 And Sheriff's Department Defendants…………………………... 210
Count 46: Unreasonable Seizure and Improper Treatment Methods
 Against Individual NYAP Defendants…………………………..... 211
Count 47: Failure in their Duties against Individual CASA Defendants……. 212
Count 48: Concealment of Evidence Violations against Individual
 County Prosecutors and DHHR…………………………………... 213
Count 49: Conspiracy Violations against Individual County, Prosecutor's
 Office, Sheriff's Department, DHHR, and CHS Defendants……... 214
Count 50: Fabrication of False Evidence against Individual County,
 Prosecutor's Office and Sheriff's Department……………………. 215

Count 51: Individual Supervisory Defendant Violations........................ 216

Conspiracy in Violation of 42 U.S.C. § 1985(2) and (3)

Count 52: Obstruction of Justice against Individual County, Prosecutor's
   Office and Sheriff's Department...................................... 217
Count 53: Witness Tampering against Individual County, Prosecutor's
   Office, DHHR and NYAP.............................................. 218

Conspiracy in Violation of 42 U.S.C. § 1986

Count 54: Conspiracy against All Individual Supervisory Defendants......... 218

Violation of 42 U.S.C. § 1983 of Plaintiff's Fourteenth Amendment Equal Protection
Rights

Count 55: Against Individual DHHR and CHS Defendants.................... 219
Count 56: Against Individual Prosecutor and Sheriff's Department
   Defendants................................................................ 220
Count 57: Against Individual School and School District Defendants.......... 221
Count 58: Against Individual NYAP Defendants................................. 222
Count 59: Against Individual CASA Defendants................................. 223

Violation of 42 U.S.C. § 1983 of Plaintiff's Fourteenth Amendment Due Process Rights

Count 60: Against Individual DHHR and CHS Defendants.................... 224
Count 61: Against Individual County and Sheriff's Department
   Defendants................................................................ 225
Count 62: Against Individual Defendants School and School District........ 227
Count 63: Against Individual NYAP Defendants................................. 228
Count 64: Against Individual CASA Defendants................................. 229

Conspiracy in Violation of 42 U.S.C. § 1985(2) and (3)

Count 65: Obstruction of Justice against Individual County, Prosecutor's
   Office  and Sheriff's Department Defendants........................ 230
Count 66: Witness Tampering against Individual County, Prosecutor's
   Office, DHHR and NYAP Defendants................................ 231

Conspiracy in Violation of 42 U.S.C. § 1986

Count 67: Conspiracy against All Individual Supervisory Defendants......... 233

STATE LAW CLAIMS..................................................................... 234

    Deprivation of Rights under West Virginia's Constitution Against
    All Defendants............................................................... 234

    Deprivation of Rights under West Virginia's Constitution Against DHHR..... 235

    Intentional and Negligent Infliction of Emotional Distress Against
    All Defendants............................................................. 236

    Invasion of Privacy Disclosure of Embarrassing Private Facts
    Against Defendants Sims................................................... 237

    Invasion of Privacy against Defendants Sims, Rasheed, Matschat,
    Demory, Hall, Duncan, Driscoll, Slater-Madert and Brittingham............. 239

    Invasion of Privacy against Defendants Demory, Rjasko Windle and
    Thomas.................................................................... 240

    Malicious Prosecution against Defendants Demory, Moskowitz, Sims
    Rasheed, Matschat, Hall, Duncan, Driscoll, Slater-Madert, Kohler
    and Brittingham............................................................ 241

    Abuse of Process against Defendants Dougherty, Demory, Gibson,
    Brittingham, Lorenzetti, Sims, Rasheed, Matschat, Duncan
    and Driscoll............................................................... 243

    False Arrest against Sheriff's Department.................................. 244

    Prayer for Relief......................................................... 245

## NATURE OF ACTION

### A.    Michael Frederick

1.    This is a civil action for damages and injunctive relief under 42 U.S. Code § 1983, 42 U.S. Code § 1985, 42 U.S. Code § 1986, 42 U.S. Code § 1988(b), 42 U.S. Code § 1320d-6 and the laws of the State of West Virginia arising from one of the most unsettling occurrences of the sheriff's department, prosecutorial misconduct, and governmental overreach in the present day history of West Virginia, which resulted in charges brought and maintained against an innocent man over a period of more than three years.

2.    From June 11, 2014 to June 28, 2017, Defendants, individually and in concert initiated an investigation into allegations of sexual abuse by the Plaintiff and during the course of the investigation Plaintiff's constitutional rights to a familial association were forcefully deprived.   Defendants' knew that there was a procedural failure of the compulsory process during preliminary hearing prior to indictments.   Defendants' maliciously conspired to seek indictments for: Counts 1-3: First Degree Sexual Assault, Counts 4-6 Sexual Abuse by a Parent or Guardian, Count 7: Obstructing an Officer, and Count 8: Fleeing from an Officer; causing a federal probation violation.   Defendants' knew that these charges were a complete total fabrication of claims which time and again were contradicted by the alleged victim's initial statements, physical evidence, documentary evidence, other witnesses, plus multiple recantations of the accuser herself.   Additionally, the accuser had made previous claims of a different perpetrator in a different jurisdiction of which they knew and failed to investigate.   In their rush to charge

and convict, the Defendants' willfully ignored and were deliberately indifferent to overwhelming evidence of the Plaintiff's actual innocence.

3.    After the Plaintiff asserted a procedural right, the Defendants' used their "win at all cost" conduct to orchestrate, manufacture and bring a retaliatory charge. Defendants' presented an application before a Magistrate Judge for the issuance of an arrest warrant for sending alleged obscene, anonymous, harassing and threatening communications; with deliberate disregard for the truth, reckless misstatements and omission of material facts culminating in an arrest. Defendants' used this manufactured retaliatory charge to revoke the Plaintiff's bond.  To further achieve their goal, the Defendants' submitted to the trial court, as evidence, a false affidavit to support the revocation of Plaintiff's bond. Defendants' knew that these charges were completely and utterly unsupported by probable cause.  Due to the Defendants' intentional malicious, evil acts the Plaintiff's bond was revoked and the Plaintiff was jailed. As a direct proximate result of their actions, while incarcerated at the Eastern Regional Jail, the Plaintiff suffered a vicious sexual assault by three inmates.

4.    In addition, the Defendants' used their position to foreclose on the Plaintiff's alibi witness through channeling down, threats, and intimidation; filled in the gaps of the accusers story by use of a trauma narrative, and used the accuser's inconsistent and demonstrably false allegations to advance their contentious nature.  When threatened by the truth of being exposed, the Defendants' set about conspiring to conceal exculpatory evidence to continue and maintain the charges for which they knew to be untrue.

5.   After the Circuit Court Judge and the Supreme Court of Appeals of West Virginia ruled in favor of the Plaintiff, the Defendants' still refused to turn over all the exculpatory evidence.   Conversely, rather than adjust their conduct, after Supreme Court Chief Justice Ketchum squarely rejected and disavowed them, the Defendants' continued their behavior by failing to obtain courts orders and search warrants for protected documents that were seized and used to defame Plaintiff in order to cover up their actions.   The Defendants' actions evidenced a reckless, willful and wanton misconduct with callous disregard, and deliberate indifference to the Plaintiff's constitutional rights; and the Defendants' abuse of process and responsibilities to the criminal justice system.

6.   As a direct result of the Defendants' malicious actions, the Plaintiff has suffered deprivations of the rights guaranteed to him under the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the Constitution of the United States, and the Constitution of West Virginia; has suffered economic, emotional, physical harm, and irreparable harm to his reputation; and the loss of his family, incurred thousands of dollars in medical and legal fees defending himself against a criminal prosecution that the Defendants' knew was baseless.

7.   Moreover, because the Defendants' policies, customs, practices, and supervisory misconduct raises a substantial risk of irreparable injury to other persons in Jefferson County, West Virginia, Plaintiff seeks the entry of an Order and Permanent Injunction, as set forth in further detail below, to protect all persons and to prevent such misconduct from ever happening again.

# PARTIES

## A.    The Plaintiffs

8.    Plaintiff Michael W. Frederick is and was, at all times relevant, a citizen and a resident of Jefferson County, West Virginia and was the Operations Manger of Exclusive Flooring LLC and is sole proprietor of Exclusive Painting & Remodeling.

9.    Plaintiff Diane H. Frederick is and was, at all times relevant, a citizen, and was a resident of Jefferson County, West Virginia and is now a resident of Fairfax County, Virginia; is the appointed Attorney-in-Fact for Plaintiff Michael W. Frederick whose Power of Attorney is governed by the laws of the State of West Virginia and, at all times relevant, granted the power to maintain, institute, defend and arbitrate any and all actions, suits, attachments and legal proceedings for or against Plaintiff Michael W. Fredrick including the power to appear on his behalf and to assert any claim before any court, board or tribunal.

## B.    The Defendants

10.    Defendant West Virginia Department of Health and Human Services (hereinafter "Defendant DHHR") is a department of the State of West Virginia and conducts business in Jefferson County and Berkley County, West Virginia.

11.    Defendant Kathy Bradley (hereinafter "Defendant Bradley") is the Community Service Manager for Defendant DHHR and conducts business in the State of West Virginia.  Based upon information and belief, Defendant Bradley supervised this matter, that resulted in this complaint.

12. Defendant Shelly J. Nicewarner (hereinafter "Defendant Nicewarner") is a Community Service Manager for Defendant DHHR, Defendant Nicewarner had supervisory authority over Defendant Hall.   Based upon information and belief, is a resident of Jefferson County and Defendant Nicewarner supervised this matter, that resulted in this complaint.

13. Defendant Rebecca Hall (hereinafter "Defendant Hall") serves as CPS Supervisor with the Defendant DHHR, and has supervisory authority over the Defendants DHHR employees.   Based upon information and belief, resides in Jefferson County and Defendant Hall supervised this matter, that resulted in this complaint.

14. Anita B. Duncan (hereinafter "Defendant Duncan") based upon information and belief, is a resident of Berkley County, West Virginia and has supervisory authority over trainee Defendant Driscoll.   Based on information and belief, Defendant Duncan supervised this matter, that resulted in this complaint.

15. Defendant Lisa M. Driscoll (hereinafter "Defendant Driscoll") is an employee and trainee of Defendant DHHR, and, her role as a problem identifier was to thoroughly investigate and evaluate this matter, that resulted in this complaint. Based upon information and belief, is a resident of Jefferson County.   Based upon information and belief, Defendant Driscoll was the problem identifier. that resulted in this complaint

16. Collectively, Defendants Bradley, Nicewarner, Hall, Duncan and Driscoll are described here as the "Individual DHHR Defendants".

17. Defendant Jefferson County (hereinafter "Defendant County") is a West Virginia County located in the eastern panhandle of West Virginia.

18.  Defendant County Sheriff's Department (hereinafter "Defendant Sheriff's Department") is the sheriff's department for Defendant County.

19.  Defendant Pete Dougherty, (hereinafter "Defendant Dougherty") is the elected Sheriff in Defendant County.  Defendant Dougherty has supervisory oversight over all employees at Defendant Sheriff's Department.  Based on information and belief, is a resident of Jefferson County.

20.  Defendant V. C. Lupus (hereinafter "Defendant Lupus") is a Sergeant in Defendant Sheriff's Department and, based upon information and belief, is a resident of Jefferson County and has supervisory authority.

21.  Defendant Steven Holz (hereinafter "Defendant Holz") is a Sergeant in Defendant Sheriff's Department and, based upon information and belief, is a resident of Berkley County, West Virginia and has supervisory authority over Defendant Demory.  Based on information and belief, Defendant Holz supervised this matter that resulted in this complaint,

22.  Defendant Scott Demory (hereinafter "Defendant Demory") is a Detective with the Defendant Sheriff's Department and upon information and belief is a resident of Jefferson County.

23.  Defendant Sharon Moskowitz, (hereinafter "Defendant Moskowitz") is a Deputy with the `Defendants Sheriff's Department.  Based upon information and belief is a resident of Jefferson County.

24.  Defendant R. Rjasko (hereinafter "Defendant Rjasko") is a Deputy with the Defendants Sheriff's Department and based upon information and belief a resident of Jefferson County.

25.   Defendant Thomas (hereinafter "Defendant Thomas") is a Deputy First Class with the Defendants Sheriff's Department and upon information and belief is a resident of Jefferson County. Defendant Thomas' first name is unknown to Plaintiff at this time.

26.   Defendant J. P. Windle (hereinafter "Defendant Windle") is a Corporal with Defendants Sheriff's Department and upon information and belief is a resident of Jefferson County.

27.   Collectively, Defendants Dougherty, Lupus, Holz, Demory, Moskowitz, Rjasko, Thomas, and Windle are described here as "Individual Sheriff Defendants".

28.   Defendant Ralph A. Lorenzetti, Jr. (hereinafter "Defendant Lorenzetti") is a resident of Harpers Ferry, West Virginia, and, at all times relevant to this action, was the elected Prosecuting Attorney for Defendant County.   Defendant Lorenzetti had supervisory oversight over all Jefferson County Assistant Prosecuting Attorneys, including Defendants Sims, Rasheed, and Matschat.   As of January 1, 2017, Defendant Lorenzetti no longer holds the elected position of the Prosecuting Attorney for Defendant County.

29.   Defendant Brandon C. H. Sims (hereinafter "Defendant Sims") was, at all times relevant to this action, Assistant Prosecuting Attorney for Defendant County, and, upon information and belief, resides in the State of Maryland.   On November 17, 2016, the State of West Virginia, Office of Disciplinary Counsel opened an official investigation in relation to this cause of action.   On or/about the end of December 2016, Defendant Sims initiated and was granted a ninety-day (90)

Family Medical Leave.  Defendant Sims' employment with the Defendant County was terminated prior to her return due in part to this cause of action.

30.     Defendant Hassan S. Rasheed (hereinafter "Defendant Rasheed") was, at all times relevant to this action, Assistant Prosecuting Attorney for Defendant County, and, upon information and belief, is a resident of Berkley County, West Virginia. On November 17, 2016, the State of West Virginia, Office of Disciplinary Counsel opened an official investigation in relation to this cause of action. Defendant Rasheed resigned his position with Defendant County and is now an employee of the Prosecuting Attorney's Office of Berkley County, West Virginia.

31.     Lyndsey W. Matschat (hereinafter "Defendant Matschat") was at all times relevant to this action, Assistant Prosecuting Attorney for Defendant County, and, upon information and is a resident of Berkley County, West Virginia.

32.     Collectively, Defendants Lorenzetti, Sims, Rasheed and Matschat are described here as "Individual Prosecutor Defendants".

33.     Defendant Jefferson County School District (hereinafter "Defendant School District") is located in Defendant County.

34.     Defendant Bondy S. Gibson (hereinafter "Defendant Gibson") is the Superintendant of Defendant School District and conducts business in Defendant County.  Based upon information and belief is a resident of Jefferson County.

35.     Defendant Blue Ridge Elementary School (hereinafter "Defendant School") is located in Defendant School District and conducts business in Jefferson County.

36.     Defendant Susan T, Zigler (hereinafter "Defendant Zigler") is the Principal of Defendant School, and upon information and belief, is a resident of Jefferson

8

County.    Defendant Zigler has supervisory authority over all employees of Defendant School.

37.    Defendant Brandan Caton (hereinafter "Defendant Caton") is Assistant Principal at Defendant School, and, upon information and belief, is a resident of Berkley County.    Defendant Caton has supervisory authority over all employees of Defendant School.

38.    Defendant Mary Brittingham (hereinafter "Defendant Brittingham") is a school counselor with Defendant School and, upon information and belief is a resident of Jefferson County.

39.    Collectively, Defendants Gibson, Zigler, Caton and Brittingham are describe here as "Individual School Defendants".

40.    Defendant Children's Home Society of WV (hereinafter "Defendant CHS") an initiative of Defendant DHHR/Bureau of Children and Families, serves as a base for regional services and conducts business in the State of West Virginia.

41.    Defendant Debora Barthlow (hereinafter "Defendant Barlow") is the Regional Director of Defendant CHS) and conducts business in State of West Virginia.

42.    Defendant Victoria Slater-Madert (hereinafter "Defendant Slater-Madert") is the Child and Family Services Supervisor for Defendant CHS and conducts business in the State of West Virginia.

43.    Defendant Emily R. Hawver (hereinafter "Defendant Hawver") is an employee of Defendant CHS and conducts business in the State of West Virginia.

44. Defendant Safe Haven Child Advocacy Center (hereinafter "Defendant CAC") is child advocacy program of Defendant CHS and conducts business in the State of West Virginia.

45. Collectively, Defendants Barthlow, Slater-Madert, and Hawver are described as "Individual CHS and CAC Defendants".

46. Defendant National Youth Advocate Program (hereinafter "Defendant NYAP") serves as a base for regional services and conducts business in the State of West Virginia.

47. Defendant Rene Ellenberger (hereinafter "Defendant Ellenberger") is the West Virginia State Program Director with Defendant NYAP and conducts business in the State of West Virginia.

48. Defendant Abigayle Kohler (hereinafter "Defendant Kohler") is the Clinical Coordinator of the West Virginia Operations for Defendant NYAP and conducts business in the State of West Virginia.

49. Collectively, Defendants Ellenberger and Kohler are described as the "Individual NYAP Defendants"

50. Defendant CASA of the Eastern Panhandle, Inc. (hereinafter "Defendant CASA") is a Court appointed special advocates volunteer organization who provides a Judge with valuable information about the child's environment in order to help the Court make a sound judgment on the child's placement and conducts business in the State of West Virginia.

51. Vicki L. Barnard (hereinafter "Defendant Barnard") is the Executive Director of Defendant CASA and conducts business in the State of West Virginia.

52.   Defendant Rebekah Overstreet (hereinafter "Defendant Overstreet") is a Child Advocate with Defendant CASA and conducts business in the State of West Virginia.

53.   Collectively, Defendants Barnard and Overstreet are described as the "Individual CASA Defendants".

54.   Each Defendant above is a "person" within the meaning of 42 U.S. Code § 1983.

55.   This action arises out of the Defendants' actions in investigating allegations of child sexual abuse.

**JURISDICTION AND VENUE**

59.   These actions arise under the First, Fourth, Fifth, Ninth and Fourteenth Amendments to the Constitution of the United States and the Constitution of West Virginia; 42 U.S. Code § 1983, 42 U.S. Code § 1985, 42 U.S. Code § 1986, 42 U.S. Code § 1988(b), and the protected freedom from unauthorized intrusion under 42 U.S. Code § 1320d-6.

57.   This Court has original jurisdiction over Plaintiff's constitutional and federal law claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a).

58.   This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a) because they are part of the same case and controversy described by Plaintiffs' federal claims, and independent original jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1332 because these actions are between citizens of different states and the matter in controversy exceeds the sum of $75,000 exclusive of interest and costs.

59.   Venue is proper in the Northern District of West Virginia pursuant to 28 U.S.C.

§ § 1391(a)(1), (b)(1), (2), and (3), because most or all of the Defendants reside and may be found in the Eastern Panhandle of West Virginia and a substantial part of the events giving rise to these claims occurred in the Eastern Panhandle of West Virginia.

60.   The events underlying this Complaint occurred within Jefferson County, West Virginia and this matter is otherwise in the jurisdiction of this court.

## FACTUAL ALLEGATIONS

### 1.   The Blue Ridge Elementary School Interview

61.   S.F. is the eight-year-old daughter of Plaintiff Michael Frederick.

62.   On the last day of school, June 11, 2014, upon arrival at Defendant School, S.F. saw Defendant Brittingham, in the hall and stated she needed to talk with her.

63.   Upon information and belief, at approximately 9:15 a.m. Defendant Brittingham retrieved S.F. from her classroom and took S.F. to her office.

64.   Defendant Brittingham reported when she entered the classroom, S.F. was telling her third grade teacher, Mrs. Hassenei, about a planned trip to South Africa to see her grandmother this summer as well as a vacation to Florida and Busch Gardens.

65.   Once in the office, Defendant Brittingham asked S.F. if that was the news she wanted to talk to her about and she stated "no".

66.   S.F disclosed that she was upset because her 5th grade aunt, K.J, and grandfather, K.J.'s father, were being blamed for "touching" her but claimed they did not.

67.   S.F. stated "she is not allowed around her aunt because some believed that she was inappropriately touched by her."

68.   S.F. stated "her father is the one who touched her and done other things to her in her bedroom."   Defendant Brittingham clarified her statement by asking S.F. if she meant "touching her private areas" and S.F. replied "yes."

69.   While in her office S.F disclosed to Defendant Brittingham that she told her mother of the touching but her mother said it was a dream.

70.   S.F. claims that Plaintiff Michael Frederick touched her three times when she lived in Lucketts, Virginia and one time while living in West Virginia; she reported that her mother won't believe her and her father knows the truth; that she locks her bedroom door at night and hangs something in front of the door so she can hear if he comes into her room but that he can get into her room even if it is locked; she also described kicking and screaming when he was in her bedroom.

71.   SF stated: "she wanted to be examined so they would know who hurt her."

72.   Defendant Brittingham placed a call at 10:00 a.m. to Defendant DHHR and made a report with Social Worker Casey Staubs about S.F.'s allegations of abuse.

73.   On June 11, 2014 at approximately 10:45 a.m. Casey completed a SAMS Present Danger Assessment Intake report with Defendant Brittingham and determined: "Present Danger(s) Not Indicated."

74.   At approximately 12:30 p.m. Defendant Brittingham recalled Defendant DHHR, and left a message for Defendant Hall requesting that someone come and speak with S.F.

75.   Upon information and belief, S.F. was held and subsequently questioned at the school by Defendant Driscoll without the presence or knowledge of S.F.'s parents

76.     Defendant Driscoll reported upon entering the interview room, S.F. stated she did not want to talk about the "bad things" her father did to her because she does not want him to go to jail.  S.F. initially did not want to speak about the "bad things" but once a rapport was built, S.F. relaxed and indicated that her mother and father were saying that her aunt touched her private area but it was not true.  Defendant Driscoll asked S.F. what private area meant; S.F. pointed to her vagina and said "down there".  S.F. stated she could not talk anymore about this then she would have to talk about the "bad things".

77.     On June 11, 2014, Defendant DHHR social worker Casey Staubs made a CPS referral to law enforcement.

78.     Defendant Moskowitz, a uniformed officer, was dispatched by Lt. D. Colbert at approximately 2:18 p.m. to respond to a juvenile disclosure of sexual assault at the Defendant School arriving at approximately 2:21 p.m.

79.     Upon gaining access, Defendant Moskowitz was met at the front office by Defendants Driscoll and Brittingham who escorted her to a conference room where she was given information regarding S.F.'s disclosures, school enrollment forms for S.F. and K.J. and Defendant Brittingham's typed statement detailing S.F.'s disclosures.

80.     Defendant Moskowitz reported that S.F. claimed her aunt and her mother had been blamed for touching her but it was her father,

81.     Defendants Brittingham, Driscoll and Moskowitz were aware of S.F.'s statements that her 5th grade aunt, K.F, and her grandfather were being blamed for touching

her but made no attempt to affirm why S.F made statements about K.F. and her grandfather being blamed for touching her.

82. Defendants Brittingham, Driscoll and Moskowitz were aware S.F. was not allowed to be around her aunt, K.J, because some believed K.J inappropriately touched her yet failed to corroborate why S.F. was not allowed around her 5th grade aunt because some believed she was inappropriately touched by K.F.

83. Defendants Brittingham, Driscoll and Moskowitz were aware that S.F told her mother of the touching by her father but her mother said it was a dream.

84. Defendants Brittingham, Driscoll and Moskowitz willfully ignored and/or were deliberately indifferent with respect to S.F statements.

85. Upon information and belief, by their show of authority and force, Defendants Brittingham, Driscoll and Moskowitz, individually and in concert, seized and held S.F. from approximately 9:15 a.m. to 3:05 p.m., with no prior consent or notification to a parent after they were made aware by Defendant DHHR Social Worker Casey at approximately 10:45 a.m. there was "No Danger Present".

86. Upon information and belief, the Supervisory Defendants were also aware of S.F.'s seizure from approximately 9:15 a.m. to 3:05 p.m., with no prior consent or notification to a parent, yet they willfully ignored and/or were deliberately indifferent or grossly negligent with respect to S.F. rights to familial association.

### 2. Conclusion of Blue Ridge Middle School Investigation

87. Based upon information and belief, in their haste to discuss the "emergency safety plan" with S.F.'s parents, Defendants Driscoll and Moskowitz departed the Defendant School at approximately 3:05 p.m. and drove to the Plaintiff Michael

Frederick's family residence located at 1030 Shannondale Road, Harpers Ferry, West Virginia.

88.   Upon arrival Defendants Driscoll and Moskowitz observed multiple vehicles in the driveway; knocked on all outside doors and looked through various windows for movement inside the house.

89.   Defendant Moskowitz reported that Defendant Driscoll believed K.J. and the retired grandfather lived downstairs.

90.   On or about the same day at approximately 3:30 p. m. S.F. boards her school bus and departs the Defendant School heading for home.

91.   Based upon information and belief, Defendants Driscoll and Moskowitz were aware of the abuse allegations by S.F. when they departed the Defendant School.

92.   Defendant Driscoll willfully ignored and/or was deliberately indifferent and grossly negligent by failing to protect S.F. without notifying S.F.'s parents or confirming whether S.F. would go to Plaintiff Michael Frederick's grandmother's home or her parents home after school.

93.   Upon information and belief, the Supervisory Defendants also were aware of facts, yet, willfully ignored and/or were deliberately indifferent and grossly negligent by failing to protect S.F when she departed the Defendant School without notifying S.F.'s parents or confirming whether S.F. would be going to the Plaintiff Michael Frederick's grandmother's home after school.

### 3.   Commencement of the Criminal Investigation by the Jefferson County Sheriff's Department

94.   On Wednesday, June 11, 2014, at approximately 6:00 PM. Defendant Demory received a phone call from Defendant Moskowitz in reference to a possible sexual

abuse at 1030 Shannondale Road. Harpers Ferry located in Jefferson County, West Virginia.

95. Defendant Moskowitz' first contact with Defendant Demory initiated his responsibility as an investigator to commence a criminal investigation of S.F. claims.

96. Upon information and belief, Supervisory Defendants were also aware of the initial investigation of S.F. allegations of sexual abuse.

### 4.   Continuation of DHHR Investigation, Safety Plan and Case Management

97. Later that evening at approximately 8:27 p.m., Defendants Driscoll and Rjasko arrived at Plaintiff' residence to serve "CPS" paperwork on him and his wife.

98. Upon arrival at Plaintiff Michael Frederick's residence Defendant Driscoll raised the issue of S.F.'s "allegations".

    a. Plaintiff Michael Frederick and wife unequivocally told Defendant Driscoll that S.F. had woken up from her sleep crying and when Plaintiff Michael Frederick's wife (S.F.'s "mother") entered the room to check on S.F. she stated: "They were just in here!". S.F.'s "mother" told S.F. she was just having a "bad dream", and stated to Defendant Driscoll, because S.F. was shaken up by a bad dream, she took S.F into their bedroom to sleep for the night.

    b. Plaintiff Michael Frederick expressed to Defendant Driscoll that both he and his wife did not closely monitor S.F. access to the internet  or viewing television shows which they believed gave her bad dreams.

99.    Based upon information and belief, during the interview of Plaintiff Michael Frederick and his wife, Defendant Driscoll did not seek the truth and made no effort to confirm:

   a.    S.F statements about a planed trip to South Africa to see her grandmother, a vacation to Florida and Bush Gardens;

   b.    why S.F stated she was upset because her 5th grade aunt, K.J, and her grandfather, K.J.'s father, were being blamed for "touching her"?;

   c.    why S.F. was not allowed around her 5th grade aunt, K.J., because some believed she was inappropriately touched by her?

   d.    made no effort to confirm that the 5th grade aunt K.J and grandfather lived downstairs in the home;

   e.    made no effort to confirm, if at anytime, 5th grade K.J had inappropriate touching or contact with S.F.;

   f.    if the grandfather had inappropriately touched and/or had contact with S.F.;

   g     if any other person had inappropriate contact with S.F. in the past;

   h.    if S.F had ever made these allegations against anyone in the past.

100.   Nevertheless, Defendant Driscoll advised Plaintiff Michael Frederick and his wife that S.F. would need to stay at the Plaintiff Michael Frederick's grandmother's home as part of a "safety plan" that was being put into effect.

101.   Plaintiff Michael Frederick and his wife refused to sign a safety plan/forms presented by Defendant Driscoll because they wanted to consult with a lawyer. Defendant Driscoll threatened Plaintiff Michael Frederick and his wife, in front of

Defendant Rjasko, that if they refused to sign the forms she would go to a Magistrate to secure a warrant for their arrest.  Under duress, Plaintiff Michael Frederick and his wife signed the forms.

102.   Based upon information and belief, Defendant Driscoll failed to complete a "WV Assessment and Management System, Intake Assessment Present Danger Tool" indicating that "Child(ren) in the household were identified as UNSAFE". Therefore,

  a.   made no effort to confirm the safety of 5th grade K.J.'s in the home;

  b.   made no effort to remove K.J., a minor, from the home;

  c.   made no effort put into place a "Safety Plan" where there is cause to believe that any child in the home was at risk.

103.   At approximately 8:45 p.m., that same evening, Defendant Driscoll arrived at the home of Plaintiff Diane Frederick and Plaintiff's Michael Frederick's grandmother's house located at 15 Shenandoah River Drive, Harpers Ferry, West Virginia where S.F.'s was already staying for the summer--her home away from home.

104.   Defendant Driscoll presented a Temporary Protection Plan to Plaintiff Michael Frederick's grandmother about S.F.'s allegations of sexual abuse advising:

  a.   that a Temporary Protection Plan was being put in place;

  b.   that S.F. would need to remain at Plaintiff Michael Frederick's grandmother's home;

  c.   that the Protection Plan would end on June 18, 2014;

    d.    that Plaintiff Michael Frederick and his wife, aunt, K.J. and S.F's grandfather were to have no contact with S.F.

105.    Defendant Driscoll unlawfully seized S.F. by show of authority and force, through threats and intimidations to the Plaintiff Michael Frederick and his wife depriving Plaintiff Michael Frederick of his constitutional right to a familial association.

106.    Defendant Driscoll's failure to remove all children from Plaintiff Michael Frederick's household is evidence she willfully ignored and/or was deliberately indifferent to the Plaintiff Michael Frederick when she removed S.F. and was grossly negligent by failing to remove and protect K.J.

107.    Based on information and belief, Defendant Driscoll foreclosed any objective search for the truth.  Defendant Driscoll's actions evidence a reckless, callous disregard to the substance of the investigation, and willfully ignored, was deliberately indifferent and/or grossly negligent with respect to the evidence demonstrating the innocence of Plaintiff Michael Frederick and his constitutional right to a familial association.

108.    Upon information and belief, Defendants Hall and Duncan were also aware of the "sensitive situation" of the underlying investigation; yet, they willfully ignored and/or were deliberately indifferent and/or grossly negligent with respect to the evidence demonstrating the innocence of Plaintiff Michael Frederick and his constitutional right to a familial association.

        **5.    S.F Gives Contradictory Statements to CAC Forensic Interviewer**

109.    On or about June 12, 2014, without obtaining any court order, Defendant Demory coordinated with Defendant DHHR scheduling a forensic interview of S.F. with

Defendant CHS intended for use in a criminal proceeding against Plaintiff Michael Frederick.

110. Plaintiff Michael Frederick's grandmother received a phone call on June 12, 2014 from Defendant Slater-Madert instructing her to transport S.F. to Defendant CHS on June 13, 2014 at approximately 2:30 p.m. for the forensic interview with Medody Soukup at the Defendant CAC.

111. Prior to the scheduled interview neither Defendant DHHR nor Plaintiff Michael Frederick's grandmother had custody of S.F. These actions are a clear constitutional violation of a familial association that a reasonable person would have known.

112. On June 13, 2014, Plaintiff Michael Frederick's grandmother and his sister, Y.A., the minor daughter of Plaintiff Diane Frederick, arrived at Defendant CAC. Upon arrival, they were met by Defendant Slater-Madert who stated she would be conducting the forensic interview of S.F.

113. Plaintiff Michael Frederick's grandmother was asked to fill out paperwork on behalf of S.F, to the best of her knowledge, but refused to sign a consent form allowing the video taping and its use for training purposes. Plaintiff Michael Frederick's grandmother was not authorized to sign paperwork on behalf of S.F.

114. Defendant Slater-Madert handed Plaintiff Michael Frederick's grandmother a folder containing a brochure entitled: TALKING WITH YOUR CHILD ABOUT "BODY SAFETY" by the West Virginia Child Advocacy Network and supported by the Office for Victims of Crime, U.S. Department of Justice.

115. Examples in the "Body Safety" brochure included the following:

     a.    DO NOT ask direct questions such as "has uncle Bob ever touched your private parts?"  If you suspect your child is a victim of abuse, ask in general about different people that come in contact with him.

     b.    DO NOT use dolls or stuffed animals to demonstrate body parts or touching--this can invite "magical thinking" into the scenario, as children commonly engage in pretend play with toys.

116.    On June 13, 2014, Defendant Slater-Madert conducted a forensic interview of S.F. for approximately three hours at Defendant CAC.   Without a court order, this action constituted an illegal search and seizure of S.F.

117.     Defendant Demory was present at the forensic interview, searching without a warrant, with the intent to use the interview against Plaintiff Michael Frederick for a criminal proceeding.

118.    Defendant Slater-Madert consistently asked S.F. leading questions throughout the interview using anatomical drawings and dolls as an evaluation technique and tool.

119.    Upon information and belief, Defendant Demory was aware of the fact that Defendant Slater-Mater consistently asked S.F leading questions throughout the interview and used anatomical drawings and dolls as an evaluation technique and tool.

120.    S.F.'s bizarre behavior and statements throughout the interview, led by Defendant Slater-Madert, are widely conflicting, patently implausible, inconsistent statements to Defendant Slater-Madert that contradicts S.F.'s various accounts. S.F. was unable to keep her story straight and continued to change critical details

about the alleged abuse, household and immediate family members. For example: (a) the purported times of how long recess was at school, first it was five minutes then its was two hours, (b) she claimed their were forty fish in the tank when in fact their were ten, (c) said her clothes were messed up, then at the end she pulled them up, (d) told the interviewer later that her pants and underwear were on the ground, her shirt was on but when her "mom" came in she put her underwear and pants back on (d) claimed that she had to get a key for the kitchen door at night from her "mom and dad" in order to get a drink of water. There was no door, there was no lock, and, of course, there was no key, (e) claimed the lock on the kitchen door because someone broke into the house. Again, there was no burglar and there was no break-in,

121.   Based upon information and belief, the interviewer failed to comply with protocols incorporated in the West Virginia Child and Abuse laws for interviewing children and the protocols developed by the Department of Justice for interviewing children.

122.   Collectively, Defendants Driscoll, Demory and Slater-Madert were aware of the inconsistent statements including S.F.'s additional contradictions in various accounts, yet, in their rush to charge, they willfully ignored and/or were deliberately indifferent or grossly negligent to this evidence demonstrating Plaintiff Michael Frederick's innocence.

123.   Based upon and information and belief, the Supervisory Defendants were also aware of the facts, yet in their rush to charge, they willfully ignored and/or were

deliberately indifferent or grossly negligent with respect this evidence demonstrating Plaintiff Michael Frederick's innocence.

### 6.   S.F Recants Her Sexual Abuse Allegations

124.   On June 13, 2014, upon returning home from the Defendant CAC interview, Plaintiff Michael Frederick's sister, Y.A. and S.F. went into Y.A.'s bedroom closing the door.  A few minutes later Y.A. came out and stated S.F. told her "she had lied; S.F began crying and begging Plaintiff Michael Frederick's grandmother to take her back to Defendant CAC so she could tell them "she lied".  S.F. stated she did not want to go to the forensic exam because:  "When they examine me they won't find anything and that will prove my dad's innocence."

125.   Later that evening, Y.A. recorded S.F., without her knowledge, saying she lied about Plaintiff Michael Frederick "touching her" and that "he didn't do it" and "it wasn't true".

126.   Shortly after Y.A. again recorded S.F. without her knowledge.  S.F. told Y.A. that everything she told the lady that day was a lie.  Y.A. wanted to know why S.F. decided to do that."  S.F. stated: "I don't know, it's because… sometimes I hate my dad, sometimes I don't.  I lied, I lied."

127.   Based on information and belief, Defendant Demory would have been made aware of S.F.'s recantations if he had attempted to interview Plaintiff Michael Frederick, his wife, other household members and Plaintiff's immediate family members after S.F.'s forensic interview.  Instead, Defendant Demory foreclosed on any objective search for the truth and, in his rush to charge, willfully ignored

and/or was deliberately indifferent or grossly negligent with respect to the evidence demonstrating Plaintiff Michael Frederick's innocence.

128.   Based upon and information and belief, the Supervisory Defendants' were, at all times relevant to this action, aware of the facts, yet in their rush to charge, they willfully ignored and/or were deliberately indifferent or grossly negligent with respect to the evidence demonstrating Plaintiff Michael Frederick's innocence.

### 7.   The Arrest of Plaintiff Michael Frederick

129.   On June 14, 2014, as a direct result of an improperly motivated investigation and the grossly negligent interview, Defendant Demory swore out a criminal complaint, secured a warrant for sexual abuse by a parent or guardian for the arrest of Plaintiff Michael Frederick.

130.   Subsequently, Defendant Demory requested that Defendant Windle and his shift attempt to serve the warrant for the Plaintiff Michael Frederick.

131.   On or about 8:31 p.m., that same evening, Defendants Rjasko and Thomas arrived at the residence of Plaintiff Michael Frederick with a warrant for his arrest.

132   Defendant Rjasko reports as he and Defendant Thomas were about to leave he observed a car pull into the driveway.  Defendant Rjasko approached the driver who he recognized as Plaintiff Michael Frederick's wife.

133.   Defendant Rjasko asked Plaintiff Michael Frederick's wife if he was at home. She stated he was at work.

134.   In the presence of Defendant Rjasko, Plaintiff Michael Frederick's wife placed a cell phone call to Plaintiff Michael Frederick who then spoke with Defendant

Rjasko and made arrangements to meet him at approximately 10:15 p.m. that same evening at his residence.

135. On or about 10:44 p.m. Defendant Windle arrived at the residence of Plaintiff Michael Frederick to attempt a warrant for his arrest. Defendant Windle reported that Defendants Rjasko and Thomas were already at the Plaintiff Michael Frederick's residence to assist him.

136. Defendant Windle advised Plaintiff Michael Frederick's wife that he was there to serve paperwork and asked her to have Plaintiff Michael Frederick step out of the residence.

137. Plaintiff Michael Frederick complied with Defendant Windle' directive and took one step out the back door of his residence. Upon stepping out of the door, Defendants Windle and Rjasko, by force, slammed Plaintiff Michael Frederick, onto the back deck of the residence demanding he give them his hands. Defendant Thomas drew his tazer placing it on the back of Plaintiff Michael Frederick's neck telling him if he didn't comply he would use the tazer. One of the Defendants' stated to Plaintiff Michael Frederick, "This is what happens when you molest children."

138. Plaintiff Michael Frederick was arrested at approximately 10:52 p.m., transported from his residence to the Eastern Regional Jail by Defendant Rjasko. While in route, Defendant Rjasko repeatedly called the Plaintiff Michael Frederick a child abuser, pedophile, a sick human being, and stated, "Wait until you get to jail and see what happens to people who molest children".

139.  Subsequently, Defendant Windle contacted Defendant Demory by phone to advise him Plaintiff Michael Frederick was arrested at his residence.

140.  As a result, for approximately the next nineteen hours Plaintiff Michael Frederick remained in a holding cell and was verbally bullied by people passing by the cell.

141.  On June 15, 2014, Defendant Windle filed a Criminal Complaint/Warrantless Arrest before a Magistrate and charged the Plaintiff Michael Frederick with Obstructing an Officer and Fleeing an Officer.

142.  Plaintiff Michael Frederick appeared before Magistrate Boober setting an excessive bail of $350,000, a direct contradiction to the Bill of Rights, the U.S. Constitution and Article III, Section 3-5 of the West Virginia Constitution.

143.  Subsequently, on that evening, Plaintiff Michael Frederick's wife and family posted his excessive bail and he was released.

144.  Following these events, *The Journal*, a Charles Town, West Virginia newspaper, *reported* on details of the arrest of Plaintiff Michael Frederick.  The article also contained information on the extensive evidence that lacked reliability of the negligent Defendant CAC interview, described events of the alleged sexual abuse and details of how Plaintiff Michael Frederick resisted arrest, attempted to flee until an officer had to threaten him with a tazer in order to make him comply.

145.  Upon information and belief, Defendants Windle, Rjasko and Thomas actions shock the conscious, offend the canons of decency and fairness that express time-tested notions of justice for even the most heinous of criminals.  Defendants' were aware that Plaintiff Michael Frederick previously arranged with Defendant

Rjasko, to meet him at his residence, yet they willfully ignored and/or were deliberately indifferent to his voluntary cooperation.

146. Upon information and belief, the Supervisory Defendants' were, at all times relevant to this action, aware of the facts, yet they willfully ignored and/or were deliberately indifferent Plaintiff Michael Frederick's voluntary cooperation.

### 8. Commencement of the Investigation by the Jefferson County Prosecutor's Office

147. On or about June 16, 2014 Defendant Rasheed and Sims worked in conjunction with Defendant Matschat, of the Jefferson County Prosecutor's Office.

148. Defendant Rasheed and Sims commenced their criminal prosecution and directed the Defendant Sheriff's Office's factual investigation of the allegations against Plaintiff Michael Frederick.

149. Defendant Matschat, counsel for Defendant DHHR prosecuted the Abuse and Neglect case against Plaintiff Michael Frederick and his wife.

150. Upon information and belief, the Supervisory Defendant was also aware of the initial investigation and prosecution of Plaintiff Michael Frederick.

### 9. U.S. District Court for the Eastern District of Virginia Probation Violation

151. Previously, on or about, March of 2008, Plaintiff Michael Frederick was charged in the United States District Court for the Eastern District of Virginia with one count of interstate transportation of a stolen motor vehicle and discharge of pollutants into waters of the United States and was just thirty-seven days away from completing his Federal probation on July 21, 2014.

152.  On June 16, 2014, Defendant Lupus contacted Mrs. Carolyn Nulf, with the U.S. Probation Eastern District of Virginia, advised Mrs. Nulf of Plaintiff Michael Frederick's arrest and provided her with a copy of the arrest warrant.

153.  Based upon information and belief, after being notified of Plaintiff Michael Frederick's arrest, Ms. Nulf immediately secured a warrant of arrest for a Federal probation violation.

154.  Plaintiff Michael Frederick turned himself into the Alexandria Detention Center within one hour after learning there was an arrest warrant for a Federal Probation violation related to this action.

155   Upon information and belief Defendant Rasheed and Sims were aware of these facts, directed and coordinated with the Jefferson County Sheriff Office, Federal Prosecutors Office and the U.S. Probation Eastern District of Virginia and, at all times, briefed Defendant Matschat.

156.  Upon information and belief, the Supervisory Defendant was, at all times relevant to this action, aware of the initial investigation and prosecution of Plaintiff Michael Frederick.

### 10.   Initiation of DHHR Custody of S.F. and the Abuse & Neglect Petition

157.  Plaintiff Michael Frederick's grandmother received a phone call from Defendant Driscoll who inquired about S.F.'s welfare and questioned her about her willingness to believe S.F. about the alleged sexual abuse in order to support her.

158.  On June 17, 2014, Plaintiff Michael Frederick's grandmother received another phone call from Defendant Driscoll who advised her that once Defendant DHHR

obtained temporary custody of S.F. she would be required to sign paperwork to establish guardianship and a foster care residence.

159. Upon information and belief, Defendant Matschat was, at all times relevant to this action, aware of all of the particulars prior to initiating the Abuse and Neglect Petition and an order for temporary custody on behalf of Defendant DHHR.

160. On that same day, the Honorable Michael D. Lorensen, Judge of the 23rd Judicial Circuit, ADJUDGED and ORDERED:

   a. that the care, custody and control of S.F. was hereby awarded to Defendant DHHR and;

   b. that during the aforesaid grant of temporary custody, Defendant DHHR was authorized and empowered to give written consent for any necessary hospitalization, inoculation, medical, psychiatric or psychological treatment, surgical or dental care;

   c. that Attorney Ruth A. McQuade was appointed as *guardian ad litem* for S.F.;

   d. that Attorney Jeffrey Matherly was appointed to represent Plaintiff Michael Frederick's wife;

   e. that an attorney from the Jefferson County Public Defenders Office be appointed to represent Plaintiff Michael Frederick.

161. Not withstanding, their knowledge of numerous inconsistencies and contractions of S.F.'s version of the events, their repeated refusal to investigate and interview family members who could provide evidence for Plaintiff Michael Frederick and his wife's innocence, prior to the June 17, 2014 filing of the Abuse and Neglect

Petition and the order for temporary custody was disrgarded. As a direct and foreseeable consequence of Defendants Driscoll and Matschat's conduct, Plaintiff Michael Frederick suffered deprivations of his rights under the Fourth and Fourteenth Amendments to the U.S. Constitution and Article III, Section 3-10 of the West Virginia Constitution

162. Upon information and belief, the Supervisory Defendants were, at all times relevant to this action, aware Plaintiff Michael Frederick would suffer a deprivation of his Constitutional Rights.

**11.     The Medical Forensic Examination Contradicts S.F. Claims**

163. Plaintiff Michael Frederick's grandmother received a call from a nurse at the Winchester Center Emergency Room to schedule S.F.'s forensic examine on June 18, 2014 at approximately 2:00 p.m.

164. On June 18, 2014, Plaintiff Michael Frederick's grandmother, accompanied by Y.A., transported S.F. to the Winchester Medical Center Emergency Room for a Forensic Medical Evaluation arriving at approximately 2:10 p.m.  Both Plaintiff Michael Frederick's grandmother and Plaintiff Diane Frederick's minor daughter, Y.A., were present during the forensic examination.

165. Forensic Nurse, Betty Fischer, performed a vaginal and anal examination of S.F. After completing the vaginal/Anal examination Nurse Fisher stated:  "I don't see any problems."  All findings were determined to be normal.

166. After departing the Winchester Medical Center, S.F. stated to Y.A. and Plaintiff Michael Frederick's grandmother:

    a.     "That exam was weird"!

      b.     "Do you know why they did it because I lied?"

      c.     "Thank God my dad is not going to jail".

      d.     "Can I tell the lady when she comes that I lied".

167.    On June 19, 2014, Forensic Nurse Fisher submits the results of a Pre/peri-pubescent Forensic Medical Evaluation of S.F. to Defendants Demory and Driscoll. Noting:

      a.     performed photo-magnification tissue traction;

      b.     Fresh or Healing Acute:  the examination within normal limits or no findings concerning for acute;

      c.     Post-Healing or Sear: Sub-Acute was not applicable to the examination;

      d.     Anal/Perianal:  Other: no other lesions/findings visualized,

      e.     S.F denied problems of Pain/bleeding and hard stools;

168.    The observation of the photo-magnification tissue forensic examination confirms no physical or medical evidence consistent with either rape or traumatic assault claimed by S.F.

169.    Upon information and belief, Defendant Demory took custody of the photo-magnification tissue traction CD that was performed at the Winchester Medical Center by Forensic Nurse Fisher as evidence and turned the CD over to Defendants Sims, Rasheed, Matschat, and Driscoll.

170.    Upon information and belief, Defendants Sims, Rasheed, Matschat, Driscoll and Demory were aware of the medical and scientific evidence that further refuted S.F. claims, yet they willfully ignored and/or were deliberately indifferent to this evidence demonstrating Plaintiff Michael Frederick's innocence.

171.   Upon information and belief, the Supervisory Defendants' were also aware of the medical and scientific evidence that further refuted S.F. claims, yet they willfully ignored and/or were deliberately indifferent to this evidence demonstrating Plaintiff Michael Frederick's innocence.

### 12.    The June 19, 2014 Federal Motions Hearing

172.   Before the hearing of June 19, 2014, Defendant Driscoll stopped by Plaintiff Michael Frederick's grandmother's house to:

   a.    drop off a copy of the Order of Temporary Custody for S.F.;

   b.    to inform her that a preliminary hearing was being held where the State would present evidence to determine if Plaintiff Michael Frederick and his wife's parental rights should be terminated;

   c.    that her Supervisor was wondering who posted bail for Plaintiff Michael Frederick.

173.   On that same day, a Federal motions hearing was held before Magistrate Judge Theresa C. Buchanan to determine the government's position for Plaintiff Michael Frederick's probation violation.

174.   During the June 19, 2014 hearing Defendant Demory testified under oath to the following statements:

   a.    that he did not investigated S.F.'s statements made to the counselor at the school;

   b.    that he did not investigate S.F.'s statements whether she was going to South Africa, Busch Gardens or on a vacation to Florida for the summer and did not know if that was true or false;

c.   that he did not investigate S.F. statements that K.F. or the grandfather had been accused of touching her and did not know whether that was true or false;

d.   that those subjects came up during the forensic interview but he had not investigated and did not try to corroborate any of those statements,

e.   that he had no idea whether S.F. had made similar claims of another perpetrator in another jurisdiction and he had not investigated those claims;

f.   that the medical examination of S.F. came back normal suggesting no physical damage;

g.   that he did not investigate whether S.F. had recanted her allegations of sexual abuse against her father.

175.   During the June 19, 2014 hearing Plaintiff Diane Frederick testified under oath to the following statements:

a.   that S.F. had made accusations against "his wife's" former boyfriend in another jurisdiction and that she had immediately notified CPS of Loudoun County, Virginia;

b.   that the preliminary medical examination by the doctor turned up nothing;

c.   that S.F. had recanted her sexual abuse allegations against the Plaintiff Michael Frederick and S.F. asked if she could speak to her alone;

d.   that S.F. tried to tell them it was a dream but that they did not believe her,

e.   that S.F. said they kept "pushing me";

f.   that Detective Demory never spoke or interviewed S.F in person;

g.    that S.F wanted to talk with her CPS worker because she wanted to tell the CPS worker she lied;

h.    that no trips to South Africa, Busch Gardens or Florida were planned for the summer,

i.    that S.F. had a history of lying;,

j.    that she was aware that Y.A. made recordings that S.F. lied;

k.    that S.F. had told her it was a dream;

l.    that the CPS worker had told S.F. she wasn't able to go home if her dad got out on bond.

176.    During the June 19, 2014 hearing Plaintiff Michael Frederick's wife testified under oath to the following statements:

a.    that S.F. had made sexual abuse allegations against her former boyfriend for touching her;

b.    that she took S.F. for a check up at the hospital and the exam came back normal;

c.    that she believed that S.F. recanted her allegations against the Plaintiff;

d.    that she had heard the recording that S.F. had lied;

e.    that they did not have any plans to go to South Africa, Busch Gardens or Florida the summer,

f.    that S.F. did not have a very good history of telling the truth and that they would catch S.F. in lies all the time;

g.    that she was present when the Plaintiff Michael Frederick was arrested by law enforcement;

    h.    that she came home from work and there were three cop cars in her driveway;

    i.    that she spoke with the officers and said that Plaintiff would not be home from work until late;

    j.    that she called Plaintiff Michael Frederick on her cell phone and that he spoke with an officer;

    k.    that the officer made arrangements to meet Plaintiff Michael Frederick at home around 10:15 p.m.;

    l.    that the officers arrived shortly after Plaintiff Michael Frederick came home;

    m.    that the officers informed Plaintiff Michael Frederick and his wife that they had paperwork to serve;

    n.    that the Plaintiff Michael Frederick stepped out of the house and they slammed him onto the floor,

    o.    that Plaintiff Michael Frederick did not try to flee at all and knew that they were there for his arrest.

177.    Upon information and belief, Defendants Sims, Rasheed and Demory were aware of the evidence that further refuted S.F. claims, yet they willfully ignored and/or were deliberately indifferent to the exculpatory evidence demonstrating Plaintiff Michael Frederick's innocence and they continued to sustain the charges.

178.    Upon information and belief, the Supervisory Defendants were also aware of the evidence that further refuted S.F. claims, yet they willfully ignored and/or were

deliberately indifferent to this exculpatory evidence demonstrating Plaintiff Michael Frederick's innocence and still continued to sustain the charges.

### 13.   S.F.'s Prior History of False Sexual Abuse Allegations

179.   On or about July 19, 2014, Defendant Demory learned that S.F. had claimed several years earlier a remarkably similar allegation—that she had been purportedly touched in her private areas—while she lived with the former boyfriend of Plaintiff Michael Frederick's wife in Loudoun County, Ashburn, Virginia.  The genital and rectal examinations performed at the INOVA Loudoun Hospital on June 21, 2008 ultimately contradicted her prior sexual abuse allegation which was reported to Loudoun County CPS by the INOVA Loudoun Hospital physician, Plaintiff Michael Frederick, his wife and Plaintiff Diane Frederick.  In the end, Plaintiff Michael Frederick and his wife had declined to pursue the allegations any further.

180.   Upon information and belief, Defendants Sims, Rasheed, Matschat, Driscoll and Demory were aware of these facts, yet willfully ignored and/or were deliberately indifferent to the developing exculpatory evidence demonstrating Plaintiff Michael Frederick's innocence and continued to sustain their prosecution of Plaintiff Michael Frederick.

181.   Upon information and belief, the Supervisory Defendants were also aware of facts, yet willfully ignored and/or were deliberately indifferent to the developing exculpatory evidence demonstrating Plaintiff Michael Frederick's innocence and continued to sustain their prosecution of Plaintiff Michael Frederick.

### 14.    June 23, 2014 Federal Evidentiary Hearing

182.    Before the hearing on June 23, 2014, Plaintiff Diane Frederick and Plaintiff Michael Frederick's grandmother met with Defendants Hall and Driscoll to sign paperwork for the guardianship of S.F. and to fill out paperwork for an FBI background check and fingerprinting.

183.    On that same day, a Federal motions evidentiary hearing was held before USDC Judge Anthony J. Trenga to determine revocation of Plaintiff Michael Frederick's detention order.

184.    Prior to motions hearing, Judge Trenga reviewed "under seal" the Defendant CAC interview of S.F. and listened to the voice recordings of S.F. recantations provided by Plaintiff Michael Frederick's attorney.

185.    The Court was made aware that Defendants Demory and Slater-Madert were present as witnesses for the prosecution.

186.    During the June 23, 2014 hearing Plaintiff Diane Frederick testified under oath to the following statements:

    a.    that she had just gotten out of a two hour meeting with Defendant DHHR discussing the rules and conditions regarding S.F.'s guardianship;

    b.    that S.F.'s normal daily activities were left up to Plaintiff Diane Frederick and Plaintiff Michael Frederick's grandmother and that S.F. was not to have any contact with Plaintiff Michael Frederick's or his wife;

    c.    that S.F. had made allegations when she was four years old against another man, a gentleman whom Plaintiff Michael Frederick's wife was dating, had touched her private parts;

d.     that Plaintiff Diane Frederick had reported the incident to (Loudoun County, Virginia) CPS;

e.     that S.F. was examined and the doctor reported everything was normal;

f.     that S.F. began talking about a dream but stated "that sometimes you think they are real";

g.     that S.F. stated during the CAC interview that Defendant Slater-Madert kept "pushing her" and "pushing her";

h.     that S.F. had stated at least ten times that she lied to get him in trouble;

i.     that S.F. had recanted her allegations on tape;

j.     that Y.A. had recorded S.F. allegations on tape and were best friends and playmates since S.F. was born;

k.     that Plaintiff Michael Frederick and his wife were watching a movie in their bedroom together with both bedroom doors wide open when Plaintiff Michael Frederick and his wife heard S.F. crying;

l.     that when Plaintiff Michael Frederick's wife entered S.F.'s bedroom, S.F. was fully clothed with her baby blanket, that she sleeps with every night, wrapped around her head;

m.     that she questioned both Plaintiff Michael Frederick and his wife if they were in their bedroom watching a movie together and heard S.F. crying;

n.     that Plaintiff Michael Frederick's half sister, K.J. and his father resided in the home located in Lucketts, Virginia where S.F. and K.J. slept in a separate room and shared bunk beds together.

187.   During the June 23, 2014 hearing Plaintiff Michael Frederick's wife testified under oath to the following statements:

    a.   that she was separated from Plaintiff Michael Frederick and, while apart, dated someone else and they were living together;

    b.   that she was aware that S.F, at the age of four, made a sexual abuse allegation against her former boyfriend of whom she lived with, and had reported it to (Loudoun County, Virginia) CPS;

    c.   that she and Plaintiff Michael Frederick were lying in bed together watching a movie somewhere between midnight and one o'clock when she heard her daughter crying; got up to check on her and S.F. stated. "They were just in here!"

    d.   that Plaintiff Michael Frederick got up out of bed, opened the basement door to see and or hear if anybody was there;

    e.   that the Plaintiff Michael Frederick had no opportunity to be alone in bed because she was with him;

    f.   that she had never taken any preventive steps for S.F. being exposed to pornography;

    g.   that S.F. had access to the computer and websites to watch movies where pornography pop-ups came up and knew that S.F. had seen the pop-ups;

    h.   that she had never been interviewed by anyone from law enforcement about this incident involving the Plaintiff Michael Frederick;

188.   During the June 23, 2014 hearing Plaintiff Michael Frederick's testified under oath to the following statement:

a.    that he had never sexually abused S.F. in any way

189.    Judge Trenga declined to hear testimony from Defendants Demory and Slater-Madert because he had reviewed the CAC interview and listened to the recantation recordings of S.F and heard witness testimony.

190.    As a side comment, Judge Trenga stated: "… I find it surprising that no one from law enforcement has yet to interview the Defendant's wife."

191.    Judge Trenga stated he wanted to wait for the West Virginia authorities to have their preliminary hearing on July 2, 2014 in Jefferson County and set the matter down for a status conference and further review of Plaintiff Michael Frederick's status on July 3, 2014.

192.    Upon information and belief, Defendants Sims, Rasheed and Demory were aware of the evidence that further refuted S.F. claims, yet they willfully ignored and/or were deliberately indifferent to the developing exculpatory evidence demonstrating Plaintiff Michael Frederick's innocence and continued to sustain the charges.

193.    Upon information and belief, the Supervisory Defendants were also aware of the evidence that further refuted S.F. claims, yet they willfully ignored and/or were deliberately indifferent to this developing exculpatory evidence demonstrating Plaintiff Michael Frederick's innocence and they continued to sustain the charges.

### 15.    Inquiry by Loudoun County, VA Sheriff's Office

194.    Defendant Demory spoke with Detective Sullivan from the Loudoun County Sheriffs Department in reference to S.F. disclosures and advised Detective Sullivan of the alleged incidents in their jurisdiction; advised her that there was a

CAC CD of a forensic interview and made arrangements for her to obtain a copy of the CAC CD.

195.    On or about June 25, 2014, Detective Christopher Staubs from the Virginia Loudoun County Sheriff's Office, the primary investigator for Plaintiff Michael Frederick's Federal case, and Detective Sullivan stopped by the Alexandria Detention Center and spoke with the Plaintiff Michael Frederick.

196.    Detective Staubs was aware of the previous sexual abuse allegations that S.F. had made against the Plaintiff Michael Frederick wife's former boyfriend.

197.    Plaintiff Michael Frederick and Detective Staubs discussed S.F. previous allegations against former boyfriend.  Plaintiff Michael Frederick wanted to know why he was sitting in jail and not the former boyfriend.  Detective Staubs affirmed that he knew the former boyfriend had been interviewed and "had heard" that the former boyfriend said his finger had slipped.

198.    Subsequently, Defendant Demory spoke with Detective Sullivan who advised him she had briefly spoken with the Plaintiff Michael Frederick in reference to S.F. allegations.

199.    The Alexandria Detention Jail recorded exculpatory conversations confirming Plaintiff Michael Frederick and his wife's discussion about Detectives Staubs' and Sullivan's regarding S.F.'s alleged sexual abuse against Plaintiff Michael Frederick wife's former boyfriend.

200.    On or about June 27, 2014, Plaintiff Michael Frederick's wife spoke with Detective Staubs in detail about S.F. sexual abuse allegations against the Plaintiff Michael Frederick and her allegations of sexual abuse against her former

boyfriend. She confirmed that Plaintiff Michael Frederick had never done anything inappropriate to S.F.

### 16. Kingship Support Placement

201    Plaintiff Michael Frederick's grandmother met with Defendant DHHR, Home Finding Specialist, Diana Collins, filled out kinship support paperwork, completed a home study, a home safety check and developed a home fire escape plan.

202.    Diana Collins informed Plaintiff Michael Frederick's grandmother that, in under a year, Defendant DHHR was moving forward with adoption proceedings of S.F.

203.    Defendant Driscoll informed Plaintiff Michael Frederick's grandmother that S.F.'s *guardian ad litem* scheduled an appointment to stop by and speak with her. S.F. asked Plaintiff Michael Frederick's grandmother when her *guardian ad litem* came if she "Should I tell her that I lied"?

204.    On June 30, 2014, Defendants Duncan and Driscoll stopped by Plaintiff Michael Frederick's grandmother's home to inform her that Defendant Driscoll was being relieved of her duties as it related to the Defendant DHHR Abuse and Neglect case against Plaintiff Michael Frederick.

205.    Defendant Driscoll and Defendant Duncan informed Plaintiff Diane Frederick and Plaintiff Michael Frederick's grandmother that S.F was now being streamed lined for adoption; it could take place in under a year, and that was the direction Defendant DHHR was headed with respect to S.F.

206.    Defendant Duncan then asked to speak with Plaintiff Diane Frederick's mother privately. Defendant Duncan, in the presence of Defendant Driscoll, instited that

Plaintiff Diane Frederick and Y.A. move out of the home they shared with Plaintiff Michael Frederick's grandmother.

207.   On July 1, 2014, as required, Defendant Duncan, Plaintiff Diane Frederick and Y.A. vacated their home.  Plaintiff Diane Frederick moved to Berryville, Virginia while Y.A. placed with her fraternal grandmother in Ashburn, VA where she remains today.

208.   Subsequently, Plaintiff Diane Frederick's made a request with Defendant Duncan for biweekly visitations with S.F. at Martinsburg, West Virginia Home Base facility for herself and Y.A.  This request was unequivocally denied, thus prohibiting Plaintiff Diane Frederick and Y.A. a familial association with S.F.

209.   As a direct and foreseeable consequence of Defendant Duncan's conduct, Plaintiff Diane Frederick and Y.A. suffered deprivations of their rights under the Fourteenth Amendment to the U.S. Constitution and Article III, Section 3-10 of the West Virginia Constitution.

### 17.   Court Appointment of CASA

210.   On June 30, 2014, The Honorable Michael D. Lorensen, under Chapter 49, Article 6 to the West Virginia Code, appointed Defendant CASA volunteer advocates for S.F. to:

   a.   contemplate his/her independent gathering of information into the circumstances of children, receipts, pleadings, orders, submissions of report to the Court, and Notice of attendance at any Court proceedings,

   b.   attend Multidisciplinary Treatment Team meetings,

   c.   do Defendant DHHR administrative reviews involving children, and

44

d.   carry out the duties and responsibilities of a special Court Appointed Special Advocate,

The Court further ordered,

f.   authorization for Defendant CASA to inspect all records for information, medical or otherwise, and their general welfare, as well as any family member, parent, or guardians, and

e.   closely monitor all matters until relieved by the Court.

211.   On July 2, 2014 Defendant Overstreet was made aware of S.F.'s recantations and provided copies of transcribed recordings that S.F. lied to Defendant Slater-Mater during her CAC Interview.

### 18.   The July 1, 2014 Preliminary Hearing for a Petition for Termination of Parental Rights

212.   Attorney Kate Harding with the Jefferson County Public Defenders Office was assigned to represent Plaintiff Michael Frederick prior to this preliminary hearing.

213.   On July 1, 2014, Plaintiff Michael Frederick and his wife appeared before The Honorable Judge Michael Lorensen for a previously scheduled prehearing on the Petition for Termination of their parental rights filed by Defendant Matschat on behalf of Defendant DHHR and by its agent Defendant Driscoll.

214.   At the hearing, Defendant Matschat, counsel for Defendants DHHR and its agent, Defendant Driscoll, requested that a privilege log created by Defendant Brittingham with specific redacted line items of her June 11, 2014 report be placed under seal.  Attached to the privilege log was a redacted and unredacted version of the same report.

215.   Judge Lorensen questioned Defendant DHHR counsel as to the purpose for the redaction of the report.  Defendant DHHR counsel stated:  "Judge let's just say the cat will be let out of the bag so to speak."

216.   The Court upon review of the reports submitted found that it was appropriate to redact the document and ORDERED that both versions of Defendant Brittingham's document tendered by Defendant DHHR counsel be filed "under seal".

217.   Based upon information and belief, Defendant DHHR intentionally withheld the unredacted, exculpatory privilege log from Plaintiff Michael Frederick in order to cover up the seizure and no prior consent from the parents of S.F. by Defendants Brittingham and Driscoll because they knew no exigent circumstances existed at the time of the seizure.

218.   Defendant DHHR was aware the privilege log pertained to Defendant Brittingham's initial intake report at 9:45 with Defendant DHHR Social Work Casey Staubs who completed a SAMS Present Danger Assessment at 10:45 a.m. on June 11, 2014 and determined that:  "Present Dangers(s) Not Indicted."

219.   Defendant Sims was present at the preliminary hearing for the Petition to terminate parental rights of Plaintiff Michael Frederick and his wife and was also aware of the exculpatory evidence contained in the privilege log placed "under seal".

220.   At the hearing, Kate Harding informed Plaintiff Diane Frederick that she had spoken to the Ruth McQuade, S.F.'s *guardian at litem*, who stated that Defendant

Demory stated to her: "there may been enough to charge Plaintiff Michael Frederick but not enough to convict".

### 19.    The July 2, 2014 Preliminary & Probable Cause Hearing for Fleeing on Foot, Obstruction & Sexual Abuse by Parent

221.   Plaintiff Michael Frederick retained The Law Offices of Sherman L. Lambert, Sr. for his criminal matter, who submitted a Notice of Appearance to represent Plaintiff Michael Frederick.

222.   On July 2, 2014 a preliminary or a probable cause hearing for Cases 14-F-376 and 14-M-1940-1 was held for Plaintiff Michael Frederick in the Jefferson County, West Virginia Magistrate Court before Judge William Senseney.

223.   The Court informed Plaintiff Michael Frederick that he, through his counsel, Sherman Lambert, would have the ability to cross-examine the State's witnesses and call witnesses on his behalf.

224.   At the hearing Defendant Sims called Defendant Slater-Madert as the State's witness to question and introduced the Defendant CAC forensic audio interview of S.F.

225.   During the July 2, 2014 hearing Defendant Salter-Madert testified under oath to the following statements:

    a.    her education and credentials;

    b.    that she interviewed S.F and S.F was an eight year old;

    c.    that she interviewed S.F. in her office;

    d.    that the request for the forensic interview was made by CPS and the Jefferson County Sheriff's Office;

    e.    that the interview was done for the criminal proceedings;

47

f.      that S.F. described the people she lived with;

g       that the situation had taken place a month earlier;

h.      that Sophia had reported the assault to her mom but was told it was a nightmare;

i.      that S.F gave sensory details;

j.      that when asked what things felt like or what she heard. S.F. was able to respond;

k.      that she used anatomical drawings and anatomical dolls to described what had happened to S.F.

226.    Because the audio quality of the CAC interview video was very poor,  Mr. Lambert asked the Court for a Motion to Strike based upon the grounds that:

a.      the sound quality was inaudible, that the defect could be cured, that they could continue and come back with proper speakers, because there was no way to cure the defect

b.      he had nothing to do all day and was amenable to standing down, getting speakers, so that he could listen to it and make his notes;

c.      Plaintiff Michael Frederick was at a disadvantage if anything was missed because of the poor audio quality;

d.      his "client" is here for a preliminary hearing on a very serious charge;

e.      the Court was making a ruling based upon a portion of the demonstrative evidence and what was being heard;

     f.    he couldn't argue against what he couldn't hear, and should have an opportunity to cross-examine the witness and question her so that the Court could determine if the defendant did it;

     g.    he didn't believe a word that S.F. said and could tell the Court why if he was given an opportunity.

227.    The Court denied the Motion to Strike the portion of the presented evidence and denied Plaintiff Michael Frederick the opportunity to cross-examine Defendant Slater-Madert or introduce any of his own witnesses.

228.    At this time, Mr. Lambert vouched for the record that the Court needed to recuse the matter on the grounds that cross-examination was a "constitutional right"; that Plaintiff Michael Frederick had been deprived of that right; and that the Court had ruled to deny him an opportunity to cross-examine a witness that was provided by the State, and which was "unheard of".

229.    Judge Senseney queried Defendant Sims, "Does he have the right to cross-examine a witness?"

230.    Defendant Sims replied, "I don't know, this has never come up before."

231.    The Court felt positive that it had the ability to make a determination on the evidence presented.

232.    Mr. Lambert disagreed stating that he needed to put on record that Judge Senseney should rescue himself from the case simply because Plaintiff Michael Frederick did not have an opportunity to cross-examine the State's witness to give the Court record a full reflection as to what had happened.   Mr. Lambert stated there was great, great inconsistencies and he was not afforded an opportunity to

share his notes that he had with the witness on behalf of Plaintiff Michael Frederick.

233. Judge Senseney felt that he didn't think it was necessary for him to recuse himself from the preliminary hearing.

234. The Court did not allow any witnesses to testify, although, Plaintiff Michael Frederick's wife and other witnesses were present and prepared to present testimony to the Court:

a. that S.F.'s allegations during her CAC interview with Defendant Slater-Madert were completely untrue;

b. that S.F. could not identify sensory details stating that she "SAW WHAT IT FELT LIKE" ascribing, in fact, it was a dream;

c. to present scientific and medical evidence refuting S.F. claims; and

d.  that Plaintiff Michael Frederick did not obstruct or flee on foot.

235. Defendant Sims continued to justify to the court the denial of Plaintiff Michael Frederick's constitutional right to a compulsory process to cross-examine witness, to call his alibi witnesses, other witnesses and to attack the credibility of S.F. statements during the interview.

236.  Defendant Sims knew, unequivocally, that absolutely no probable cause was established at the preliminary hearing for fleeing on foot, obstruction and sexual abuse by a parent.

237. At no point during this probable cause hearing did Plaintiff Michael Frederick waive his right to a preliminary hearing for the Fleeing on Foot and Obstruction charges.

238. After the hearing, Plaintiff Michael Frederick broke down sobbing when the Court blatantly disregarded him and his family members who were there to testify on his behalf.

239 Upon information and belief, Defendants Sims and Rasheed were aware that no probable cause was established at the preliminary hearing, yet willfully ignored and/or were deliberately indifferent and grossly negligent when they abused the process for the State's benefit with respect to Plaintiff Michael Frederick's constitutional rights and continued the pending charges

240. Upon information and belief, the Supervisory Defendant was, at all times relevant, aware of these facts including the abuse of process, yet willfully ignored and/or was deliberately indifferent and grossly negligent with respect to Plaintiff Michael Frederick's constitutional rights and continued the pending charges.

### 20. The July 3, 2014 Federal Status Hearing for Supervisory Release

241. On July 3. 2014, Plaintiff Michel Frederick appeared before the USDC Judge Trenga for status hearing for supervisory release. The Court considered the CAC interview, the recorded recantations of S.F, along with testimony of all the witness who had been before the Court. When the government refused to produce S.F to testify, the Court found that the government failed to prove there was a violation of probation. The Court did take into consideration the seriousness of the matter and ruled to place Plaintiff Michael Frederick on supervised release with an ankle monitor until the West Virginia case could be resolved.

242. Plaintiff Michael Frederick was released and placed on home confinement with ankle monitoring.

243.   On or about July 22, 2014, Ms. Nulf informed Defendants Sims and Driscoll that Plaintiff Michael Frederick had been placed on home confinement with ankle monitoring.

244.   Collectively, Defendants Sims, Rasheed and Matschat were aware of all the facts including the medical and scientific evidence that refuted S.F. claims, yet they willfully ignored and/or were deliberately indifferent or grossly negligent with respect to the evidence demonstrating the innocence of Plaintiff Michael Frederick and continued the pending charges

245.   Upon information the Supervisory Defendant also was aware of these facts, including the medical and scientific evidence that further refuted S.F.'s claims, yet he willfully ignored and/or was deliberately indifferent or grossly negligent with respect to the evidence demonstrating the innocence of Plaintiff Michael Frederick and continued the pending charges.

### 21.   DHHR Removal of Infant Child S.F.

246.   On July 3, 2014, at approximately 4:00 p.m., immediately after his federal court hearing with Judge Trenga,  Defendant Driscoll and another Defendant DHHR worker arrived at Plaintiff Michael Frederick's grandmother's  home to execute the removal of  S.F from her care.

247.   Upon entering the home, Defendant Driscoll stated to the Plaintiff Michael Frederick's grandmother she had it on good authority that she could not keep S.F safe.   Plaintiff's grandmother inquired based on "whose good authority", Defendant Driscoll replied "from the jail recordings".  Defendant Driscoll asked S.F  to  come  with  her.  S.F  grabbed  onto  Plaintiff  Michael  Frederick's

grandmother's legs clutching them as Defendant Driscoll tried to pull her away. S.F. refused to let go, saying to Defendant Driscoll. "My grandmother keeps me safe." S.F. began crying, trembling and begging Defendant Driscoll not to take her away from "her family". S.F. repeatedly told Defendant Driscoll that "she had lied" to get her dad in trouble. When S.F. refused to comply, Defendant Driscoll threatened to call the police to have S.F. removed from the home.

248. Based upon information and belief, S.F was taken to Defendant DHHR by Defendant Driscoll and met by her *guardian at litem*. S.F. told Defendant Driscoll and her *guardian at litem* that she had lied to get her dad in trouble. Within a short time, both Defendant Driscoll and the *guardian ad litem* knew that S.F had been untruthful. S.F. disclosed she had hidden a diary in a clothes basket under some clothing in her playroom that she didn't want anybody to read.

249. Shortly after the removal of S.F., Plaintiff Michael Frederick's wife attended a Multi-Disciplinary Team Meeting (MDT) where Defendant Matschat, Duncan and the *guardian at litem* were in attendance. Discussions centered on the unwillingness of Plaintiff Michael Frederick's wife to believe and provide for S.F.'s emotional safety and that Defendant DHHR could not reunify her with S.F because they could not ensure S.F emotional safety.

250. Defendant Duncan applied pressure on Plaintiff Michael Frederick's wife that she needed to believe S.F, cut all contact with Plaintiff Michael Frederick, not support him, or attempt to unify her family, if she wanted S.F. returned.

251. Later that evening, Plaintiff Diane Frederick discussed the removal of S.F. with the *guardian at litem*. During the ensuing conversation, she discussed S.F.'s

lying to get her father in trouble, Judge Trenga's review of S.F.'s CAC interview, the tape recordings maintaining that she had lied, witness testimony and Judge Trenga declining to rule against Plaintiff Michael Frederick for a probation violation after consideration of the evidence,

252.  Also discussed with the *guardian at litem* was the removal of S.F. from Plaintiff Michael Frederick's grandmother home because Defendant DHHR felt she couldn't keep S.F. safe.  Plaintiff Diane Frederick expressed her concerns that S.F was being improperly reinforced by Defendant DHHR to whom she initially disclosed the abuse, especially after Defendant Driscoll told Plaintiff Michael Frederick's grandmother that no one was to discuss the allegations with S.F.

253.  The *guardian at litem* confirmed to Plaintiff Diane Frederick that:

   a.  part of the reason for S.F.'s removal was because Defendant Michael Frederick was being released on an ankle monitor,.

   b.  the family didn't believe the circumstances surrounding S.F. allegations, and

   c.  that if Plaintiff Michael Frederick's wife wanted to get S.F back, she needed to believe what S.F was saying.

254.  Later that evening on Thursday, July 3, 2014, at approximately 6:00 P.M., Defendant Demory was contacted by Defendant Driscoll to inform him that she had removed S.F. from Plaintiff Michael Frederick's grandmother's home.

255.  S.F disclosed to Defendant Driscoll that she had hidden a diary in her room under a pile of clothes at Plaintiff Michael Frederick's grandmother's home because she did not want anyone to read it.

### 22.    Search Warrant for S.F.'s Diary & Defendant's Refusal to Consider Exculpatory Evidence

256.   After Defendant Driscoll's disclosure, Defendant Demory issued a search warrant on Plaintiff Michael Frederick's grandmother's home for S.F.'s diary.

257    On Friday, July 4, 2014, the search warrant for S.F. diary was executed.

258.   The search warrant uncovered no evidence to sustain any of S.F allegations or that abuse had occurred.  Defendant Sheriff's Department recovered S.F.'s diary she had hidden under a pile of clothes in her room.  All of the entries throughout her diary disclosed she was in a "bad situation" because she had lied to the people about her dad.

259.   On July 9, 2014 S.F. 's diary was released from temporary evidence by Sgt. Sell to Detective Demory who read the diary, secured it and provided Defendants Sims and Rasheed with copies of the diary, yet, Defendant Sheriff's Department and Defendant County continued their persecution of the Plaintiff Michael Frederick.

260.   Defendants' knew that they had no evidence to corroborate S.F.'s inconsistent and contradictory accounts of the alleged sexual abuse during the CAC interview; that the forensic exam disproved her claims; that S.F. specifically professed to Defendant Driscoll and her *guardian ad litem* that she lied to get her "dad" in trouble and the recovered diary of S.F.

261.   Upon information and belief, the Supervisory Defendants were aware of these facts and the recovered evidence which they knew were flatly at odds with S.F.'s own accounts of the alleged sexual abuse.   Nevertheless, the Supervisory Defendants continued to allow Defendants' to have primarily responsibility for

the case, yet willfully ignored and/or were deliberately indifferent or grossly negligent with respect to the innocence of Plaintiff Michael Frederick and continued the pending charges.

### 23.   DHHR Placement of Infant Child S.F.

262.   On or about July 3, 2014 S.F was placed with a respite foster family until Defendant DHHR could find permanent placement for S.F

263.   On July 4, 2014 S.F. told her respite foster mother, Genevieve Jobin, that she had never seen fireworks before.

264.   During the delay to find permanent placement for S.F., she was exposed to an inappropriate interaction while residing in the respite foster home because she was not being attended to.

265.   On or about July 7, 2017 S.F was moved to her permanent placement where the foster mother, Aimee Harrison, caught S.F. stealing money from the household.

266.   On or about July 9, 2017 S.F told Defendants Hawver and Duncan several times that "her mother was able to take care of her" and didn't understand why Defendant Driscoll didn't think that "her mother could take care of her".

267.   On or about July 18, 2014 S.F. told Defendant Hawver "What happened to me was a dream, it wasn't even real".   Defendant Hawver then told S.F. "if it was a dream it was still concerning, that brains can't make that stuff up".

268.   Over the next few months, S.F. continued to reverse.   The foster parents reported to Defendants Duncan and Hawver that S.F. had lying issues an expressed that when S.F realized she won't get in trouble she will continue to lie and then tell the truth later.   Defendants Duncan and Hawver also reported that S.F. is

manipulative, that she likes to get someone else in trouble to avoid being in trouble herself and will do something to get back at whoever she feels has wronged her.   The foster mother was concerned about S.F.'s thought process about and S.F. doing something to get back at someone else.

### 24.    GoFundMe "Help an Innocent Man and Our Daughter!"

269.   On or about July 16, 2014, the wife of Plaintiff Michael Frederick created a *GoFundMe* account (www.GoFundMe.com/bogaj8) with the goal of raising $115,000 to save her family.

270.   The *GoFundMe* article centered upon the nationwide epidemic of false allegations and the destruction of her family asserting that:

a.    "Our justice system is supposed to have morals and integrity."

b.    "The police, the prosecutor and Child Protective Services come into your home and rip your family apart in the blink of an eye then leave you helpless and in complete shock with no answers."

c.    "The most disturbing part in our situation is that they didn't even do an investigation at all; an investigation that would have proven my husband's innocence."

d.    They did not speak to my husband or me as to why these accusations might have transpired." "Instead, they came into our home, ripped our daughter from us and four days later arrested my husband on felony charges."

e.    "My husband, and the father of our daughter, is now fighting for his life in the courtroom due to false allegations because unprofessional detectives

and CPS workers who are set on putting a notch on their belt instead of finding the truth.  In return they destroyed our family.  Within days, we have lost everything we worked so hard to gain.  We have lost our home and our family business due to my husband's 27-day incarceration….."

f.   "My husband is not a sexual predator.  The people that know and love him know that without a doubt.  Unfortunately, professionals in the legal system do not."

g.   "If I thought for one second that my husband is capable of these allegations I would not be asking for help to save his life and help to reunite my family."

271.   Plaintiff Diane Frederick and Plaintiff Michael Frederick's wife raised $10,177 collecting donations by knocking on doors, going to churches and stores.

272.    On or about August 15, 2014, Plaintiff Michael Frederick's engaged the services of Kirk Bottner (hereinafter "Mr. Bottner") with Bottner & Skillman and pro se Attorney Thomas Pavlinic (hereinafter "Mr. Pavlinic") with Premier Defense Group in Annapolis, Maryland.   Mr. Sherman Lambert withdrew his representation of Plaintiff Michael Frederick and his legal interest in Defendant County.

273.   Subsequently, Mr. Bottner telephones Defendant Sims to inform her that he has been retained as Plaintiff Michael Frederick's counsel.  During their telephone call Defendant Sims stated that she had discovered the *GoFundMe* website article.

274.   Based upon information belief, Defendant Sims informed Defendant Matschat of the *GoFundMe* article written by Plaintiff Michael Frederick's wife.

275.   Defendants Duncan and Matschat applied pressure on the wife of Plaintiff Michael Frederick to "shut down" and "close the site".  "Freedom of speech is the liberty to speak openly without fear of government restraint."

276.    As a direct and foreseeable consequence of Defendants Sims, Matschat, and Duncan conduct, Plaintiff Michael Frederick suffered deprivation of his rights under the First, Fourth and Fourteenth Amendments to the U.S. Constitution and Article III, Sections 3-7 and 3-10 of the West Virginia Constitution.

277.   Upon information and belief, the Supervisory Defendants' were, at all times relevant to these actions, yet willfully ignored and/or were deliberately indifferent to Plaintiff Michael Frederick with respect to the deprivation of his rights under the First, Fourth and Fourteenth Amendments to the U.S. Constitution and Article III, Sections 3-7 and 3-10 of the West Virginia Constitution.

**25.    DHHR Continues to Apply Pressure**

278.   During a Defendant DHHR Multiple Disciplinary Team (hereinafter "MDT") the attendees, Jeffery Matherly, Ruth McQuade, Plaintiff's wife plus Defendants Matschat, Duncan, and Overstreet, discussed that:

a.     Plaintiff Michael Frederick's wife continued to place her needs and that of Plaintiff Michael Frederick above the needs of S.F.;

b.     tough limitations had been placed on visitations rights with S.F. because of the overwhelming concern that she will attempt to elicit recantations from S.F. to assist in Plaintiff Michael Frederick's defense;

    c.     that she must cease all contact with Plaintiff Michael Frederick in any form:  face to face, phone, text, email, social media, or through a third party, if she were granted an Improvement Period;

    d.     that she does not believe that S.F. had been abused, however, she believed that S.F. believed that it had happened and did not do anything about it,

    e.     that she believed S.F. lied in other ways during the CAC interview and that she knew nothing happened the night S.F. says it did; that S.F. shows no emotion during the interview;

    f.     Defendant DHHR expressed concerns about the inconsistencies and discrepancies in the "wife" statements about how controlling Plaintiff Michael Frederick and his family were and her actions;

    g.     DHHR also expressed concerns that although they hoped for S.F. sakes that she was genuine," there was little faith that this was anything more than an act."

279.    Based upon information and belief, Mr. Matherly made it very clear to the attendees that his client would be fully participating in S.F.'s welfare as well as fully participating in Plaintiff Michael Frederick's criminal case, which included attending all his court hearings and speaking with his lawyers.

### 26.    Jefferson County Prosecuting Attorney's Office Refusal to Consider Exculpatory Evidence Prior to Indictments

280.    Notwithstanding, their knowledge of actual innocence and the numerous inconsistencies and contractions in S.F.'s version of events, Defendant Sims repeatedly refused to work with Plaintiff Michael Frederick's attorney, Mr. Bottner, who, on different occasions, offered to provide evidence prior to the

September 16, 2014 indictments.  Defendant Sims response was to make a verbal plea offer under West Virginia code § 61-8D-5, Sexual Abuse by Parent or Guardian, Custodian, or Person in a Position of Trust to Child with a Maximum of 20 years in prison.

281.   Plaintiff Michael Frederick refused the plea offer and asserted his procedural right to maintain his innocence to plead not guilty and move toward trial.  Defendant Sims response to Mr. Bottner was:  "I am going to put him away for life so that he can never be around another woman again."

282.   It is virtually unheard of that a responsible, ethical prosecuting attorney would refuse to consider evidence of innocence proffered by counsel for a putative defendant prior to seeking an indictment.

283.   On September 16, 2014, Defendant Sims successfully obtained a grand jury indictments against Plaintiff Michael Frederick for:  Counts 1-3: First Degree Sexual Assault,  Counts 4-6 Sexual Abuse by a Parent or Guardian, Count 7: Obstructing an Officer, and Count 8: Fleeing an Officer.

284.   Upon information and belief, Defendant Sims provided the CAC interview from the improperly motivated investigation presented it before the grand jury that returned Counts 1-6 of the indictments.

285.   Upon information and belief, Sgt. S. Sell with Defendant Sheriff's Department, who was a not witness of the fleeing on foot and obstruction, provided testimony before the grand jury that returned the September 16, 2014 indictments for Counts 7 and 8.

286.  Defendant Sims knew unequivocally that no probable cause was established for Counts 7 & 8 at the preliminary hearing on July 2, 2014, and that Plaintiff Michael Frederick did not wave his right to a preliminary hearing for those counts when she duly swore Sgt. Sell under oath before the grand jury.

287.  As a direct and foreseeable consequence, Plaintiff Michael Frederick suffered a deprivation of his rights under the Fourth and Fourteenth Amendments to the U.S. Constitution and Article III, Section 3-10 of the West Virginia Constitution

288..  Upon information and belief, the Supervisory Defendant was informed about the lack of evidence against Plaintiff Michael Frederick and the overwhelming evidence of his actual innocence.   Moreover, the Supervisory Defendant continued to allow Defendants Sims and Rasheed to continue their persecution of the Plaintiff Michael Frederick.

### 27.   Post-Adjudicatory Improvement Period and Psychological Evaluations

289.  On or about July 3, 2014 Defendant DHHR recommended supervised visitation for Plaintiff Michael Frederick's wife and S.F. at Home Base, Inc.

290.  On August 28, 2014, Psychologist Harold D. Slaughter with Psychological Consulting, Inc. conducted a psychological evaluation of S.F.   The evaluation disclosed that: (a) S.F. did not appear to demonstrate significant hyper vigilance or exaggerated startle response; (b) was intellectually functioning within high average rage of ability; (c) no evidence of any active psychotic features; (d) no anxiety symptomatology that would meet the full criteria for a diagnosis for Posttraumatic Stress Disorder.

291.   On or about September 3, 2014, Plaintiff Michael Frederick's wife and S.F. had their first supervised visitation at the Home Base office.

292.   On September 18, 2014, Plaintiff Michael Frederick's wife was pressured by Defendant DHHR to vacate her home on the day she was granted her post-adjudicatory improvement period and required to:

a.       participate in  a psychological evaluation and follow all recommendations of the evaluation;

b.       participate in parenting classes or resources scheduled by DHHR;

c.       participate in intensive individual counseling aimed at increasing insight;

d.       cease all communications and contact with Plaintiff Michael Frederick in form:  face to face, phone, text, email, social media, or through a third party.

293.   Shortly after Plaintiff Michael Frederick and his wife's departure from the household they begin richly communicating daily through the use of "burner phones".

294.   On September 24, 2014, Dr. Jonathan M. Hartiens with Christian Psychological Services conducted a psychological evaluation of Plaintiff Michael Frederick's wife/client.  The psychological evaluation disclosed that: (a) client denied S.F.'s claim of the alleged sexual abuse that it could not have happened on the night in questions because she was in bed with "her husband" watching a movie; (b) client hopes to regain custody of her daughter; (c) there were no complaints of depression, anxiety, worry, or distress; (d) client has little insight  into or acknowledgement of the abuse events reported by S.F. and, in fact, believed that

there was no chance that it occurred even in spite of S.F. reporting it occurred multiple times and that CPS had substantiated the reports; (e) client attributed S.F. allegations as having a bad dream or most recently that her father-in-law abused S.F.; (f) client hopes to regain custody of S.F. and move back to South Africa with her family; (g) client reported she sought separation and had initiated counseling, however, evaluator reported that client realized that she will not regain custody as long as "he" was in the home and that the counseling is a posturing behavior to appease the Court.

295.   On or about October 15, 2014, Dr. Jonathan M. Hartiens with Christian Psychological Services submitted his written psychological evaluation of Plaintiff Michael Frederick's wife to Defendant DHHR.

296.   On or about October 28, 2014 Defendant DHHR reviewed the recommendations of the psychological evaluation of Plaintiff Michael Frederick's wife; recommended psychotherapy with a clinical psychologist and agreed to assist in locating a therapist for Plaintiff Michael Frederick's wife.

### 28.   Relinquishment of Plaintiff's Parental Rights

297.   Based on information and belief, prior to Plaintiff Michael Frederick relinquishing of his parental rights to S.F., his Court appointed attorney, Kate Harding, advised that moving forward with a contested adjudication gave the State the opportunity to prepare its case early thus giving their witnesses time to practice their testimony, forcing him to expose parts of his case that he might want to save for his criminal trial such as the instances where S.F. lied in the CAC interview.

298.    On the September 18, 2014, on the advice of counsel, Plaintiff Michael Frederick was forced to relinquish his parental rights to S.F. in order to preserve his criminal case.

299.    On or about September 18, 2014, during a foster home visit, Defendant Hawver told S.F. that Plaintiff Michael Frederick relinquished his parental rights.

300.    Due to the physical, psychological, emotional and financial strain, Plaintiff Michael Frederick lost over 32 pounds during his home confinement incarceration

### 29.    The Intimidation of Plaintiff's Alibi Witness

301.    During an MDT meeting on or about December 8, 2014, Defendants Matschat, Kohler and Duncan discussed the foster parents "catch" S.F. "lying all the time" and they also stated "she takes things that she sees or hears other people doing and turns into story of something that she did."

302.    On or about December 10, 2014, Plaintiff Michael Frederick's wife emailed his attorney, Mr. Pavlinic, informing him about an MDT conversation regarding S.F. and that Defendant Kohler was working on S.F.'s lying and transference issues, stating to Mr. Pavlinic; "If she has lying issues, why isn't' the biggest lie of all being looked into?"

303.    Later that day, Thomas Pavlinic speaks to Plaintiff Michael Frederick's wife in detail about the MDT participants and what was said about S.F lying and her transference issues who stated "that DHHR is aware of the issue".  Mr. Pavlinic informed Plaintiff Michael Frederick's about his conversation with his wife. He reported she was enthusiastic and expressed interest in helping with his defense

and stated any information she received that could be of assistance she would forward and keep him updated.

304.   Upon information and belief, notwithstanding all the evidence that already showed S.F. was lying, Defendants Sims, Rasheed, Matschat, and Duncan, acting individually or in concert, stepped up their ongoing efforts to recant Plaintiff Michael Frederick's wife's position,  who was providing unequivocal support for him.

305.   Defendants Sims, Rasheed, Matschat and Duncan knew that Plaintiff Michael Frederick's wife offered critical and unequivocal alibi evidence to disprove S.F claims.

306.   Upon information and belief, acting individually or in concert, Defendant Sims, Rasheed, Matschat and Duncan directed Plaintiff Michael Frederick's wife to commence recording their daily phone conversations beginning January 15, 2015 through March 20, 2015.

307.   Upon information and belief, Defendant Sims had an expressed agreement and a meeting of the minds with Defendants Rasheed, Matschat and Duncan to assure that Plaintiff Michael Frederick's wife continued to record their privileged conversations.

308.   On or about March 20, 2015, Defendant Sims, individually or in concert, with Defendant Rasheed, Matschat and Duncan, directed Plaintiff Michael Frederick's wife to stop recording their conversations when they contained no useful inculpatory evidence to aid their criminal prosecution.  As a matter of fact they discovered there was no material of substance in the recorded conversations, and

a.    found nothing to corroborate any sexual assault claim;

b.    an abundance of exculpatory evidence favorable to Plaintiff Michael Frederick;

c.    the recordings further confirmed S.F. was lying;

d.    the "mother" herself knew no rape occurred the night S.F alleges;

e.    that Plaintiff Michael Frederick  was in the process of filing for permanent removal of his ankle monitor and would be free on his $350,000 bond.

309    Upon information and belief, the Defendants' continued their obstruction of justice by tampering with Plaintiff Michael Frederick's alibi witness instructing her to have no further phone contact and the next time Plaintiff Michael Frederick reached out to her she was directed to tell him,  "STOP CONTACTING ME"! She was also ordered to obtain a protective order, file a complaint, and have it served upon him.

310.    Upon information and belief, Defendants Sims, Rasheed, Matschat and Duncan, acting individually or in concert, assisted in composing the creation of Plaintiff Michael Frederick's wife's written narrative of the timeline of events for the alleged sexual abuse by providing her copies of case documents in order to fill in the inculpatory details of her narrative to recant her federal testimony and the statements in her psychological report.   Plaintiff Michael Frederick's wife's narrative was an intentional fabrication attempt to cover up her unequivocal version of events about the alleged incident.

311.    Upon information and belief, Defendants Sims, Rasheed, Matschat and Duncan, acting individually or in concert, to these actions with the intent to obstruct justice

and tamper with a witness by telling Plaintiff Michael Frederick's wife that she needed to change her categorical denial of the timeline of the events to strengthen their criminal prosecution, seal his fate and gain a tactical advantage over Plaintiff Michael Frederick.

312. Based upon information and belief, on or about March 20, 2015, Defendant Sims instructed Plaintiff Michael Frederick's wife to not attend a prearranged, scheduled meeting on March 21, 2015 at 9:30 a.m. with Plaintiff Michael Fredericik's attorneys, Mr. Bottner and Mr. Pavlinic.   Plaintiff Michael Frederick and his wife had an expressed agreement between themselves to meet at the office of Bottner & Skillman the morning of March 21, 2015.

313. On or about March 21, 2015 Defendant Sims called Defendant DHHR and notified Defendant Driscoll that there was a concern for S.F.'s safety because Plaintiff Michael Frederick had just found out that his wife would not be providing an alibi for him.

314. On or about Sunday, March 22, 2015,  Thomas Pavlinic writes a letter to Plaintiff Michael Frederick's wife that both he and Mr. Bottner were disappointed she had failed to show up for the scheduled meeting.

315. On or about Monday, March 23, 2015, Plaintiff Michael Frederick's lawyer, Mr. Bottner telephoned Defendant Sims.  Their conversation centered on the "wife's" alibi for Plaintiff Michael Frederick on the alleged night in question.  Defendant Sims stated to Mr. Bottner that the "wife" was no longer his alibi witness and that "she gotten the wife away from under his spell!"

316.    Upon information and belief, these were not the first instances in which the Defendants attempted to obstruct justice and to deprive Plaintiff Michael Frederick of his constitutional rights by tampering with his alibi witness who contradicted S.F.'s allegations.

317.    Upon information and belief, the Supervisory Defendants were aware of these facts, yet they willfully ignored the conspiracy and continued to allow irreparable harm to the Plaintiff Michael Frederick by tampering with his alibi witness.

### 30.    Intentional Infliction of Emotional Distress

318.    Defendants' conduct had further consequences, subjecting Plaintiff Michael Frederick to extreme and sustained obloquy, causing him to endure and suffer emotional and mental stress from the sustained charges of false allegations and continued home confinement.

319.    On or about February 20, 2015, suffering from high stress, Plaintiff Michael Frederick consulted with his primary physician, Dr. Joseph Lee, for uncontrolled heart palpitations who referred him to Cardiac Care Associates for a heart consultation

320.    On or about February 26. 2015, Plaintiff Michael Frederick met with Cardiac Care Associates who performed an EKG and made a referral to Dr. Manish Shah, with the Medistar Heart & Vascular Institute.

321.    On or about March 25, 2015, Plaintiff Michael Frederick was admitted to the Medistar Washington Hospital Center located in Washington, DC under the care of the Section of Cardiac Electrophysiology for a Cardiac Ablation procedure to

treat his Wolf-Parkinson-White Syndrome (WPW).  His cardiologist, Dr. Shah, requested removal of his ankle monitor for period of 48 hours.

322.    Based upon information and belief, Ms. Nulf alerts Defendant Sims regarding removal of the ankle monitor for a period of 48 hours.  Subsequently, Mr. Bottner received a call from Defendant Sims in reference to the removal of the ankle monitor inferring: "I know that Mr. Frederick is being removed off of his monitor for 48 hours." "Tell Mr. Frederick that it is in his best interest not to try to do anything funny to get in trouble."

323.    During a follow-up visit on March 31, 2015 with his cardiologist, Dr.Shah, Plaintiff Michael Frederick developed severe stomach pains; Dr. Shah recommended he check himself into the Emergency Room at the Reston Hospital Center in Reston, Virginia and later that day was admitted as a patient.

324.    On or about, April 2, 2015 an esophagogastroduodenoscopy was performed and established that his pain was the result of three severe stomach ulcers caused by stress.

325.    Plaintiff Michael Frederick was placed on a catheter to flush his severely infected kidneys; diagnosed with dehydration and put on an IV drip.

326.    During his 16-day hospitalization, Plaintiff Michael Frederick was treated for his ulcers but continued to experience severe stomach pain.

327.    Subsequently, it was determined that his gallbladder was causing the pain as well and, while in the state of declining health,  underwent surgery for removal of his gallbladder.

328.   Plaintiff Michael Frederick's physicians were perplexed that a healthy 30-year old adult male could be in such declining health.

329.   On or about April 11, 2015, Plaintiff Michael Frederick was transported from the Reston Hospital Center to Medistar Washington Hospital Center for a second heart ablation and discharged on April 15, 2015 returning home under doctor's care.

330.   Plaintiff Michael Frederick had scheduled follow-up medical appointments for an EDG procedure at the Reston Hospital Center on June 3, 2015 and a Post-op/EKG with Dr. Shah at his Reston, Virginia office.

331.   Defendants' were, at all times, relevant to these facts due to his continued ankle monitoring.  Throughout the history of Plaintiff Michael Frederick's case it was well established that there had been open communication for status updates between the Federal authorities, the Defendant County Prosecutor's Office and Defendants Sims, Rasheed and Matschat, yet they willfully ignored and/or were deliberately indifferent and specifically intended to cause Plaintiff Michael Frederick harm and distress.  Any reasonable person would have known that their conduct went beyond the bounds of decency and could be regarded as utterly atrocious.

332.   Upon information and belief, the Supervisory Defendants' were at all times also aware of these facts, yet willfully ignored and/or were deliberately indifferent and specifically intended to cause Plaintiff Michael Frederick harm and distress.  Any reasonable person would have known that their conduct went beyond the bounds of decency and could be regarded as utterly atrocious.

### 31.   The Manufactured Arrest of Plaintiff by Jefferson County Prosecuting Attorney's Office and the Department of Health and Human Resources

333.   Because of unforeseeable delays in Plaintiff Michael Frederick's West Virginia criminal case, Federal Supervisor Randall Hyler of the Eastern District of Virginia Probation Office determined that the length of time he was under the threat of a delayed revocation and punishment had already been imposed; and, in the absence of a finding of guilt for the underlying West Virginia State charges, Mr. Hyler made an unequivocal decision to remove Plaintiff Michael Frederick off his ankle monitoring and to terminate his Federal probation.

334.   On or about April 22, 2015, Plaintiff Michel Frederick asserted his procedural right to file a motion before Judge Trenga of the United States Eastern District of Virginia Court to have his ankle monitor removed; released from Federal probation and continue on his $350,000 bond in West Virginia.   His hearing was scheduled for May 8, 2015.

335.   On April 26, 2015, Plaintiff Michael Frederick was served with a Petition for Divorce containing his "wife's" phone number.

336.   Based upon information and belief, Defendants Sims, Rasheed, Matschat and DHHR, applied pressure upon Plaintiff Michael Frederick's alibi witness to file for divorce in order to gain a tactical advantage.

337.   As a result, Plaintiff Michael Frederick was utterly devastated, sent several text messages professing his love and heartache for his wife, S.F. and their relationship including other housekeeping matters.

338.  On or about April 26, 2015, at approximately 4.52 a.m. Plaintiff Michael Frederick texted his wife asking "for two minutes of her time".  At approximately 4:59 a.m. he received a text "Stop Contacting Me"!  Plaintiff Michael Frederick sent his last text message at approximately 12:17 p.m. that afternoon.

339.  Based upon information and belief, Defendant Sims instructed the wife of Plaintiff Michael Frederick to seek a preliminary protective order (PPO) with the Loudoun County Juvenile and Domestic Relations District Court of Virginia.

340.  On or about April 26, 2015, at approximately 1:00 p.m. Plaintiff Michael Frederick's wife applied for a PPO with Loudoun County Juvenile and Domestic Relations District Court.

341.  On or about April 28, 2015, at approximately 1:30 p.m. the Loudoun County Juvenile and Domestic Relations District Court received the PPO paperwork; presiding Judge Paula Brooks signs the PPO order and sets a hearing date on May 12, 2015.

342.  On that same day at approximately 1:37 p.m. Plaintiff Michael Frederick's wife was served with the PPO paper by the Loudoun County Sheriff's Department.

343.  On April 28, 2015 at approximately 3:00 p.m. Plaintiff Michael Frederick's wife met with Defendant Demory at Defendant Sheriff's Department in reference to being harassed by phone and text messages.

344.  On that same day at approximately 3:29 p.m., the Loudoun County Sheriff's Department stamped receipt of the PPO paperwork.

345.  On or about April 28, 2015 at approximately 4:30 p.m. Defendant Sheriff's Department served Plaintiff Michael Frederick with the PPO paperwork.

346. On or about April 29, 2015 at approximately 8:59 a.m. Defendant Sheriff's Department stamped the PPO and verified that Plaintiff Michael Frederick was served.

347. Four days later, on April 30, 2015, Defendant Demory printed out the emailed copies of the text messages provided by Plaintiff Michael Frederick's wife and drove directly to the Jefferson County Prosecuting Attorney's Office where he met with Defendants Sims and Rasheed to turn over copies of the texted messages.

348. On that same day, Defendant Sims reviewed the printed copies of the texted messages, looked up the West Virginia charging code and gave legal advice to Defendant Demory.

349. On April 30, 2015, just fourteen days after Plaintiff Michael Frederick was released from the hospital in waning health and under continued doctor's care and, eight days prior to his scheduled May 8, 2015 Federal court hearing to terminate his probation and ankle monitoring, Defendant Sims, in the presence of Defendant Rasheed instructed Defendant Demory to write up a Criminal Complaint and Warrant for Arrest applying W.Va Code § 61-3C-14(a) for sending alleged obscene, anonymous, harassing and threatening communications.

350. On the same day, Defendant Demory appeared before a Defendant County Magistrate.   The allegations by Defendant Demory in his Application for Statement of Charges for Plaintiff Michael Frederick were overall ambiguous and his stating that a protective order was filed on April 26, 2015 and served by the Defendant Sheriff's Office on that same date was a false declaration of a material

fact.   Defendant Demory was aware that the PPO had been served on April 28, 2015 at approximately 4:30 p.m. by the Defendant Sheriff's Office and did not provide probable cause that a crime had been committed by Plaintiff Michael Frederick.

351   Defendant Sims knew there had been no phone contact with Plaintiff Michael Frederick and his wife between March 20, 2015 and April 26, 2015 because she had instructed his wife to stop recording and have no contact with Plaintiff Michael Frederick.

352.   Upon information and belief when Defendant Sims instructed Defendant Demory to file the Application for the Statement of Charges she knew no probable cause existed that Plaintiff Michael Frederick had committed a crime.

353.   Defendant Sims' direct involvement in filing the Application of Statement of Charges provided erroneous legal advice to Defendant Demory that no probable cause existed to charge and arrest Plaintiff Michael Frederick prior to his filing of the Application for Statement of Charges.

354.   Notwithstanding this erroneous legal advice, Defendant Demory knew, or should have known, that no probable cause existed to bring charges against and arrest Plaintiff Michael Frederick.

355.   As a result of these improper actions of Defendants Sims, Rasheed and Demory, Plaintiff Michael Frederick was illegally arrested on May 2, 2015.   His illegal arrest was made without probable cause and demonstrated ill will, improper motivation and/or evil purpose.

356.   Plaintiff Michael Frederick was falsely charged as a direct result of a retaliatory measure for exercising his procedural right to be released off of Federal probation and ankle monitoring.

357.   As a result of this manufactured retaliatory charge, Plaintiff Michael Frederick lost his freedom and dignity; continued to suffer psychological harm and physical suffering from being arrested and detained without cause.

358.    On May 2, 2015 Plaintiff Michael Frederick appeared before Magistrate Boober and was released with a $2500 bond.

359.   On the morning of May 4, 2015, prior to attending court, Defendant Sims spoke with Plaintiff Michael Frederick's wife informing her that she would be filing a motion to revoke Plaintiff Michael Frederick's bond.

360.   Later that morning, Mr. Bottner saw Defendant Sims in the courtroom and inquired "what was going on and why was Plaintiff Michael Frederick arrested for sending out text messages for professing his love for his wife."  Defendant Sims claimed that, "she didn't know anything about the charges" and acted "surprised" when he told her about the arrest and charges.

361.   On May 4, 2015 Defendant Sims filed a motion revoking Plaintiff Michael Frederick's $350,000 bond and a bench warrant for failure to comply with the conditions of his bond.

362.   Based upon information and belief, Defendant Sims was fully aware of the May 8, 2015 motion before the Federal Court to remove Plaintiff Michael Frederick's ankle monitor and his release from Federal probation.

363.    On May 5, 2015 presiding Judge David H. Sanders signed a bench warrant for the
arrest of Plaintiff Michael Frederick.  Subsequently, he was arrested, transported
to the Eastern Regional Jail (ERJ) located in Martinsburg, WV and held pending a
bond hearing scheduled for May 11, 2015.

### a.        The May 11, 2015 Hearing

364.    At the May 11, 2015 bond revocation hearing, the Court recognized that: "The
State is here by its felony team, Mr. Hassan Rasheed and Brandy Sims, both handling this
case."

365.    At this hearing, Plaintiff Michael Frederick's attorney, Mr. Bottner addressed the
Court stating:

a.      that Plaintiff Michael Frederick had been in regular contact with his
"wife" throughout the seven months since he dropped out of the Abuse
and Neglect case;

b.      that his "wife" had been in communication with Plaintiff Michael
Frederick;

c.      that Plaintiff Michael Frederick was admitted to the hospital on March 31,
2015 and "updated his "wife" both by text and on Facebook about his
condition", "She certainly knew who that was!";

d.      that on April 26, 2015 Plaintiff Michael Frederick finally sent his "wife" a
text asking for two minutes of time after he was served with the divorce
paperwork;

e.      that was the first time she had indicated "Stop Contacting Me";

    f.      that Plaintiff Michael Frederick "sends a series of text messages to her which are essentially all one rambling thought where he is basically pleading and professing his love for her and talking about how he would like a little bit of time";

    g.      that "he didn't communicate the rest of the 26[th], the 27[th], the 28[th], the 29[th], and on the 30[th] they got an arrest warrant."

366.    At the May 11, 2015 bond revocation hearing, Mr. Pavlinic addressed the Court regarding:

    a.      the outrage of the new charges;

    b.      the Application for Statement Charges;

    c.      that Plaintiff Michael Frederick had rich communication for months and months with his wife;

    d.      the issues surrounding his arrest for harassment, stating, "we don't know what the motivation of law enforcement is on this";

    e.      the scheduled hearing on May, 8 2015 before Judge Trenga of the United States Eastern District of Virginia Court for the removal of his ankle monitor;

    f.      they knew that information was passed onto law enforcement and to the prosecutor for ankle monitoring purposes;

    g.      his concern that the State was using this as "a guise" to prevent Plaintiff Michael Frederick from being released from Federal probation and removed off his ankle monitor;

    h.      implied this would be considered misconduct on part of the prosecution.

367.   Defendant Sims addressed the Court stating:

    a.   "I first want to first address Mr. Pavlinic's concerns;

    b.   that I didn't find out Plaintiff Michael Frederick had been arrested on charges until last Monday, when Mr. Bottner himself told me;

    c.   that "I went back to my office and verified that";

    d.   that Mr. Bottner himself told me about these charges, I think my reply to that was with "surprise";

    d.   that "I had some calls from the folks in Virginia and I took the initiative and filed a Motion to Revoke his Bond because he was charged with a new offense";

    e.   that "there was no coordination with the folks in Virginia to do this to try to have some other result in that Court";

    f.   that "they did contact me but I already made that decision myself here in the courtroom".                              \

### b.   The May 18, Hearing

368.   On May 18, 2015 Defendant Sims replied to Plaintiff Michael Frederick's supplemental Motion to Reinstate Bond.

369.   Defendant Sims submitted an order to the Eastern Regional Jail requesting Plaintiff Michael Frederick be transported to the Jefferson County Courthouse for the prosecution's response to his Supplemental Motion to Reinstate Bond.

370.   Mr. Bottner, unaware that Plaintiff Michael Frederick had been transported to the courthouse, was shocked when he entered the courtroom and by happenstance saw him sitting there.

371.    After the hearing, Mr. Bottner approached Defendant Demory to inquire why he "would bring these bogus charges and trump them up against his client for sending out text messages professing his love to his wife?"

372.    Defendant Demory admitted to Mr. Bottner, an officer of the court, that Defendant Sims instructed him to swear out an Application for Statement of Charges and Warrant for Arrest for texting his "wife".

373.    Mr. Bottner contacted Mr. Pavlinic to inform him of Defendant Demory's declaration surrounding the arrest on the harassment charges for Plaintiff Michael Frederick.   Mr. Pavlinic requested that Mr. Bottner have a more in-depth conversation with Defendant Demory to find out what "precipitated" the new criminal charges.

374.    Mr. Bottner left several messages for Defendant Demory with no return calls or response.

375.    Subsequently, Mr. Bottner received a phone call from Defendant Sims, inquiring why he wanted to speak with Detective Demory stating that any questions he needed answered should go through her so that she could address any questions he had.

376.    By this action, Defendant Sims obstructed justice and subverted the truth seeking process in order to cover up her actions.

377.    On June 12, 2015 Plaintiff Michael Frederick replied to the Defendant Sims response to his Motion to Readmit Him to Bail and Requesting an Evidentiary Hearing Due to Systematic Abuse of Prosecutorial Discretion Prejudicial to the Administration of Justice:

a.    that he was served with divorce paperwork;

b.    that his wife's telephone number was provided to him in the paperwork that was served upon him on April 16, 2015;

c.    that the he professed his love and heartache for his wife in one long text,

d.    after receiving no response from her, he desisted;

e.    that Defendant Sims lied to the court that she didn't know anything about the charges;

f.    that Defendant Sims misrepresented the material facts to the court;

g.    that after the May 18, 2015 hearing Detective Demory informed Mr. Bottner that he consulted with Defendant Sims of the Jefferson County Prosecuting Attorney prior to requesting the arrest warrant;

h.    that the Jefferson County Prosecuting Attorney had manufactured the charges in retaliation because he was being released off of his ankle monitor;

i.    that Defendant Sims' conduct to the tribunal lacked candor to the court;

j.    that Defendant Sims violated Rule 3.8, 3.3 and 8.4 of the West Virginia Rules of Professional Conduct.

378.   On June 16, 2015, Defendant Sims conspired with Defendant Rasheed to fabricate a false and misleading "Affidavit" to conceal and obfuscate the allegations of misconduct made by Plaintiff Michael Frederick.   Defendant Sims, indeed, elicited an intended, actual effect by submitting to the Court the sworn "Affidavit" executed by Defendant Rasheed stating:

a.    that he spoke with Defendant Demory by telephone;

b.    that Defendant Demory advised him that the wife of Plaintiff Michael Frederick had been receiving text messages;

c.    that during his telephone conversation with Defendant Demory he had him read the texted messages over the phone;

d.    that he advised Defendant Demory there was sufficient evidence to charge Plaintiff Michael Frederick for harassment charges;

e.    that he was unaware of Plaintiff Michael Frederick being on any continued probation in another jurisdiction but rather believed he had completed such probation.

379.    Defendant Sims understood and agreed with Defendant Rasheed that the submission of the "Affidavit" provided to Plaintiff Michael Frederick and the court was under knowingly false pretenses and represented their intent to gain a tactical advantage, to conceal, disguise and cover up their misconduct of the retaliatory maneuver and to continue Plaintiff Michael Frederick's incarceration due to:

a.    his scheduled release from Federal probation;

b.    unduly and improperly influence Judge Sanders' decision to revoke his $350,000 bond;

c.    deny Plaintiff Michael Frederick his Evidentiary Hearing due to systematic abuse of the prosecutorial discretion prejudicial to the administration of justice;